Murder; ten years.
This is a vehicular homicide case. The appellant was indicted under Ala. Code § 13A-6-2 (a)(2) (Supp. 1977) for causing the death of another person while recklessly engaging in conduct which created a grave risk of death to a person other than himself under circumstances manifesting extreme indifference to human life. The appellant was charged specifically with causing the *Page 856 
deaths of Mary Miniard and Floyd Edwards by his operation of a motor vehicle while under the influence of intoxicating liquors or narcotic drugs.
Taken in the light most favorable to the State, the evidence tended to show that the appellant's Pontiac collided with a Pinto automobile, killing the occupants in the Pinto, Floyd Edwards and Mary Miniard, at approximately 1:00 A.M. on May 3, 1980. In checking the extent of the appellant's injuries as he lay "slumped over the wheel," the officers who arrived on the scene detected a "strong odor of an alcoholic nature about his person." Hospital records were introduced into evidence, over objection which, indicated that appellant's blood had a .23% ethyl alcohol content. There was no suggestion that either of the victims were under the influence of drugs or alcohol.
The appellant testified in his own behalf that he had had two mixed drinks and half a beer at a party over a period of approximately three and a half hours prior to the accident. He stated that he had his last drink "twenty or thirty minutes" before he left the party.
The crux of this appeal concerns what effect the admission of hospital records has on proving the chain of custody of evidence. Specifically, we are faced with the question whether the introduction of hospital records in conformity with Ala. Code §§ 12-21-5, -6, -7, (1975) dispenses with the requirement that the chain of custody for a blood sample allegedly taken from the appellant be proved.
Mr. Robert L. Baines, a medical laboratory technologist testified for the State that Alabama Reference Laboratories, Inc., the company by whom he was employed, did "blood work" for St. Margaret's Hospital in Montgomery. Defense counsel questioned the witness on voir dire examination and ascertained that Mr. Baines had not taken the blood sample in question from the appellant. Defense counsel then vigorously objected to any further testimony by Mr. Baines concerning the blood sample until it was "shown that someone duly qualified and licensed took the blood sample from him."
Outside the presence of the jury, defense counsel argued that the State had not followed the guidelines set out in Patton v.City of Decatur, 337 So.2d 321 (Ala. 1976), relating to Ala. Code § 32-5-193 (1975)[1], which deals with the proper methods approved by the State Board of Health for the admission of intoxication results. This statute is commonly known as the Alabama Implied Consent Law.
The assistant district attorney informed the trial court that "the State is not proceeding under the terms of the Implied Consent Law. We have no intention whatsoever of trying to get into evidence the presumptions that arise therefrom."
Indeed, there is no requirement that § 32-5-193 be used as the exclusive means for admitting intoxication test results. The Alabama Supreme Court recently stated in McGough v.Slaughter, 395 So.2d 972, 975 (Ala. 1981):
 "The legislature has by statute remedied many of the problems involved in laying a foundation for admission of intoxication test results, at least where the action arises from operation of a vehicle. See Code 1975, § 32-5-193.
 "Under [such a statute], the questions of relevancy, and to a large extent of weight, of the evidence, have thus been legislatively resolved. The [statutory intoxication] presumptions have been upheld by the courts . . . and the prescription for test procedures adopted by the state health agency had been taken as acceptance of the general reliability of such procedures in showing blood-alcohol content.
 "E. Cleary, McCormick's Handbook on the Law of Evidence § 209 at 513 (2nd ed. 1972) (footnotes omitted). *Page 857 
 "A party offering results from tests shown to be given in conformity with the statute is relieved of the burden of laying the extensive predicate generally necessary for admission of scientific test results."
While it is unnecessary for the prosecution to resort to a chemical test in order to make out a prima facie case of vehicular homicide, Patton, 337 So.2d at 324; Commander v.State, 374 So.2d 910, 917 (Ala.Cr.App. 1978), writ quashed,374 So.2d 921 (Ala. 1979), if a party wishes to have the results of a blood alcohol test admitted into evidence he has two choices; either he must show that the tests were taken in conformity with § 32-5-193, or he must lay the proper foundation for their admission under general evidence principles. McGough, 395 So.2d at 977. The admission of blood alcohol test results for which neither of these procedures is followed results in reversible error. McGough, supra.
Since the State conceded that it was not proceeding under §32-5-193 because it could not meet the requirements of that section, it was incumbent upon the State to lay a proper foundation for the admission of the appellant's blood alcohol test results under general evidence principles. McGough, supra. Following this alternative it was necessary for the State to establish that procedures were followed which would insure the reliability of the test results. In order for the test results to be reliable, and thus relevant to the matter at issue, the results must be from generally accepted tests conducted under conditions which do not impeach the reliability of the testing procedure. McGough, 395 So.2d at 977. The burden of laying the predicate generally necessary for the admission of scientific test results is extensive, McGough, supra.
With these principles in mind, we must now look to the record to see how the State attempted to meet its burden of proof under general rules of evidence. After the State's admission that it was not proceeding under § 32-5-193, the following exchange occurred:
 "MR. PRICE: He's going to have to show the chain, so he's going to have to bring her in.
 "MR. BELL: Judge, on the second page of this document that I have here, and this is really all I care about getting into evidence, it shows that a blood alcohol test was ordered.
 "On the page, on State's Exhibit No. 4, I have another medical record which shows, 5-3-80, which was the date of the accident, at 4:20 A.M., and this is a record from St. Margaret's Hospital, we show that a specimen was taken from a Willie Whetstone at the Emergency Room. The doctor was Chastain, which is the same doctor that appears on the medical records. The test was a blood alcohol test. . . ."
 "MR. PRICE: Your Honor, irrespective of the witness, of Dr. Chastain or Mr. Baines, Mr. Bell is going to have to show the chain, or what happened to that blood test after Dr. Chastain took the blood and then submitted it to whomever he submitted it to, and how it came into the possession of Mr. Baines.
"THE COURT: What about that chain, Mr. Bell?
 "MR. BELL: Judge, it's the State's position that if this witness can identify the blood sample that he examined as being the same blood sample as appears on that record and as appears on that record then any chain that there might have been would go to the weight of the blood alcohol test as opposed to the admissibility."
Continuing on voir dire examination by defense counsel, Mr. Baines testified that he received the blood sample in question from his immediate superior, Mrs. Brenda Durden. Mr. Baines stated that he did not know from whom Mrs. Durden had received the blood sample. Defense counsel then remarked:
 "Now, there's no way he can testify that's the same blood sample. You've got too many people in between."
Mr. Baines then testified for the State that the blood sample he tested "was marked *Page 858 
with the date that it was drawn by the patient's name, the hospital it came from, and the physician who ordered it." He stated that the above information on the vial of blood he examined corresponded with the hospital records in question. Mr. Baines's voir dire was concluded with the following exchange:
 "MR. PRICE: Judge, those medical records do not cover any action by Mrs. Durden. The medical records from the hospital simply show, catalogue, what the physician and nurses did, and I admit the medical records can come in under this Code of Alabama but they don't cover Mrs. Durden's actions of what she did with the blood sample after it was given to her.
"Now, the chain has to be established.
 "MR. BELL: Judge, it's the State's position that what we have there is a business record —
 "THE COURT: And you're saying the business records establish the chain?
 "MR. BELL: I'm saying that I could introduce the business records apart from anything else and of such and such and it would be admissible. In my opinion and judgment, that's the purpose of the business record is establishing things that were done in the ordinary course of business.
 "MR. PRICE: The, Judge, he cannot testify. He can introduce that business record, but Mr. Baines is not competent to testify about the blood test being taken and getting to him, and then I would conclude, and then not about the results of the blood test.
 "The business record could be established simply to show business records, and there can be no testimony about them by Mr. Baines about the blood test being taken —"
The trial court decided to allow Mr. Baines to testify before the jury and to "determine later on whether to leave that testimony in." Mr. Baines was presented to the jury as "an expert witness on blood alcohol analyses."
Mr. Baines was permitted to testify from the hospital records in question that he tested a blood specimen corresponding to a "particular entry" on a St. Margaret's Hospital record, which "identified" the specimen as belonging to the appellant, and "got the results of 0.23% ethyl alcohol." The hospital records from which Mr. Baines had testified were then introduced over objection.
A close examination of those hospital records reveals the following facts, and the following facts only, which are pertinent to the issue before us:
(1) Appellant was admitted to the emergency room at St. Margaret's Hospital at 1:20 A.M., on May 3, 1980; (2) sometime after appellant was admitted Dr. Chastain ordered a blood alcohol test on appellant's blood; (3) someone allegedly withdrew a specimen of appellant's blood at 4:20 A.M. on May 3, 1980; (4) a laboratory report from Alabama Reference Laboratories, Inc., completed on May 5, 1980, which was introduced as part of appellant's hospital records, indicated that the blood specimen allegedly taken from appellant had a 0.23% ethyl alcohol content.
There is no evidence in the hospital records, or elsewhere in the record, demonstrating who actually withdrew appellant's blood or what technique was used in withdrawing the blood sample. For example, the hospital notation does not state whether or not an alcohol wipe was used before the blood was extracted. See State v. Guthrie, 85 S.D. 228, 180 N.W.2d 143
(1970). Assuming that the blood specimen Mr. Baines examined was actually taken from the appellant there is no evidence of what was done with the specimen after it was taken and before it reached Mr. Baines.
The State offered no witnesses from St. Margaret's Hospital where appellant's blood sample was allegedly withdrawn. Mr. Baines testified that he was not at the hospital when the blood was taken, that he did not know who took appellant's blood or how it was taken, that he received the blood sample from Mrs. Durden and that he did not know from whom she received it. Mrs. Durden did not testify. *Page 859 
At the risk of being repetitive, assuming the blood sample in question was appellant's blood, the hospital records which were introduced shed no light whatsoever on what technique was used in withdrawing his blood, what efforts, if any, were used to preserve the specimen, how many times the blood sample changed hands, or what happened to the sample each time it changed hands. In short, there is a huge gap of missing information concerning the blood sample allegedly taken from appellant. There is simply no evidence that the blood sample tested by Mr. Baines was in the same or in substantially the same condition as the blood sample allegedly withdrawn from appellant.
In contrast, in Delarosa v. State, Ala.Cr.App.,384 So.2d 876, cert. denied, Ala., 384 So.2d 880 (1980), the State's evidence proved the entire sequence of events from the time the accused's blood was extracted to the time it was submitted to the testing specialist. This court implicitly recognized the necessity of establishing an unbroken chain of custody for a blood sample in Delarosa, supra at 877-78. There, we stated:
 "Dr. Austin . . . authorized registered nurse Nina Green to extract blood from appellant for routine lab work.
. . . .
 "While at the scene of the accident Corporal Nelson directed Trooper Raymond Dawson Smith to go to Jackson Hospital and obtain a specimen of blood from the appellant to determine his blood alcohol level. At approximately 1:00 A.M. on May 26, 1979, nurse Nina Green extracted a blood sample from the appellant with his consent and turned the sample over to Trooper Smith. This extraction of blood was in addition to the one authorized by Dr. Austin.
 "After the proper chain of custody was testified to, Criminalist Allen Adair, a drug identification and blood alcohol analysis expert with the Alabama Department of Forensic Sciences, testified that his analysis of the appellant's blood sample revealed a blood alcohol level of .22 grams percent by weight of ethyl alcohol." [Emphasis added]
Based on the above facts, or lack of facts, we hold that the information contained in appellant's hospital records falls short of proving the necessary chain of custody for the blood sample allegedly withdrawn from him.
In Dennison v. State, 259 Ala. 424, 427, 66 So.2d 552 (1953) the Alabama Supreme Court stated:
 "The pertinent rule is that articles or objects which relate to or tend to elucidate or explain the issues or form a part of the transaction are admissible in evidence when duly identified and shown to be in substantially the same condition as at the time of the offense."
To establish a sufficient predicate for admission into evidence it must be shown that there was no break in the chain of custody. Identification and continuity of possession must be sufficiently established to afford ample assurance of the authenticity of the item. Ex parte Yarber, 375 So.2d 1231, 1234
(Ala. 1979). "A party need not negative the remotest possibility of substitution, alteration or tampering with the evidence." Mauldin v. State, Ala.Cr.App., 402 So.2d 1106
(1981); Lynn v. State, Ala.Cr.App., 380 So.2d 366 (1980);Murrell v. State, Ala.Cr.App., 377 So.2d 1102, cert. denied,377 So.2d 1108 (Ala. 1979).
In Sexton v. State, Ala.Cr.App., 346 So.2d 1177, 1180, cert. denied, 346 So.2d 1180, we find:
 "To warrant the reception of an object in evidence against an objection than an unbroken chain of custody has not been shown, it is not necessary that it be proved to an absolute certainty but only to a reasonable probability, that the object is the same as, and not substantially different from, the object as it existed at the commencement of the chain."
Unlike the "weak link" in the chain of custody discussed inLangford v. State, Ala.Cr.App., 354 So.2d 297, reversed on other grounds, 354 So.2d 313 (Ala. 1977), we are here confronted with "missing links" in the chain of custody. Where "missing links" *Page 860 
are involved in the chain of custody the question presented is one of admissibility rather than credibility. Mauldin, supra.
Moreover, it cannot be said that Mr. Baines' testimony that appellant's blood sample registered 0.23% ethyl alcohol was harmless. Following Mr. Baines' testimony the State called Dr. C.J. Rehling, retired Director of the Department of Forensic Sciences. Dr. Rehling testified in great detail as to how one laboring under a 0.23% blood alcohol level would function. Without detailing all his testimony we have set out certain portions which are representative:
 "I . . . have observed a number of subjects under those levels . . . both with the police department and experimentally. That level of blood alcohol characterizes what is commonly referred to as a dizzy and delirious stage characterized by a staggering gait, a thick tongue, and bleary eyes, heavy eyes. The subject is conscious only of his environment right close up to him. You have difficulty getting his attention. He very often holds on to objects in order to do any walking, and he is obviously under the influence to any observer.
. . . .
 "It would very seriously affect the driving ability of the human subject. . . . The judgment centers are virtually put to sleep by that kind of level. . . .
 "The function so involved in driving a vehicle in traffic is very important for it, first of all, judgment and attitude and that is the first thing to be depressed by alcohol.
 "Also, the matter of speed of recognition, namely, it takes time to recognize an incident ahead of us as we drive. . . . That decision making process is gradually slowed down more and more, and it's well slowed down by this amount of blood alcohol level.
 "Also, the hearing of the subject is impaired and he is not cognizant of any sounds which normally he would recognize and respond to."
In the light of the above, the devastating effect of Mr. Baines' testimony was obvious.
In our judgment, Mr. Baines' testimony regarding appellant's alleged blood alcohol level should not have been admitted because under general evidence principles the State did not prove a sufficient chain of custody for the blood sample. The final question to be resolved is whether the introduction of appellant's hospital records, specifically that report from Alabama Reference Laboratories, Inc., indicating that appellant had a 0.23% ethyl alcohol content, negated the requirement which otherwise existed, that the State prove the chain of custody before admitting Mr. Baines' testimony. We answer that question negatively.
Appellant's hospital records were properly prepared and certified in conformity with Ala. Code §§ 12-21-6, -7 (1975). The language that causes problems in their admission is found in § 12-21-6 and reads as follows.
 "When so prepared and certified, the copy of said hospital records shall be admissible in evidence in any court in the state, if and when admissible, in prima facie proof of the facts therein shown just as if otherwise verified and just as if the copy were the original. . . ."
At first blush it would seem that if a copy of hospital records was prepared and certified in accordance with §§ 12-21-6 and12-21-7 then the information therein automatically becomes admissible as prima facie evidence, no matter what information was contained in the original hospital records, and no matter how the information in the originals was developed or by whom. Plainly, that is a misreading of the statute. §§ 12-21-6 and12-21-7 must be read in conjunction with § 12-21-5.
Section 12-21-5, Alabama Code, supra, in pertinent part reads:
 "When the original would be admissible . . . a certified copy . . . when certified and affirmed . . . shall be admissible in evidence, without further proof in any court in the state where admissible, if and when. . . ." (Emphasis added) *Page 861 
Clearly then, for a copy of a hospital record to be admissible and, thus, "be admissible" as to "prima facie proof of the facts therein" the original hospital records themselves would have had to be admissible. Lowery v. State, 55 Ala. App. 514,317 So.2d 365, 369, cert. denied, 294 Ala. 763, 317 So.2d 372
(1975).
Section 12-21-5 does not authorize, without qualification the carte blanche admission of all hospital records. Lowery v.State, 55 Ala. App. 511, 317 So.2d 357 (1974), rev'd on other grounds, 294 Ala. 347, 317 So.2d 360 (1975). As Judge Almon[2]
wrote for this court in the first Lowery opinion:
 "It can therefore be seen that the statute merely provides a procedure by which copies of hospital records when properly certified may be introduced into evidence without the production of the original and without the custodian of these records being present to lay a predicate. If they are otherwise admissible we see no reason to place any construction on this statute in this regard other than has been placed upon Tit. 7, § 415, (§§ 12-21 -43, 44) Code, supra. In other words, the test of relevancy still pertains as well as the opinion evidence rule and other applicable rules of evidence.
317 So.2d, at 360
(Emphasis added)
And in the second Lowery opinion authored by Judge Bookout of this court we held the following:
 "Hearsay in documents does not become admissible by merely having a custodian certify a copy to be the same as the original document. Here the copies of the hospital records could have been admitted without parol evidence of authenticity only if the original records were admissible. . . .
. . . .
 "[T]he State cannot unlock the flood gate with Act No. 77 (§§ 12-21-5, 6, 7), supra, and unleash a torrent of otherwise inadmissible hearsay evidence.
. . . .
 "We further hold that where Act No. 77, supra, is used to prove a material element in a criminal prosecution, there may arise a strong probability that the defendant may be denied his right to be confronted by witnesses and to cross examine them pursuant to Article 1, § 6, Constitution of Alabama 1901 and Amendment Six and Fourteen of the United States Constitution." 317 So.2d at 369, 370.
Thus, an accused may properly object and have excluded any portion of a copy of his hospital records where the information to which he objects would be inadmissible under general rules of evidence. Since no chain of custody was established in this case for the blood sample which was analyzed in the report by Alabama Reference Laboratories, Inc., that report should not have been admitted along with the other portions of appellant's hospital records. Defense counsel's repeated objections to the chain of custody not being established for the blood sample sufficiently preserved this question for review.
We find the following case discussed in Annot., 31 A.L.R.2d 1216 (1952) enlightening to our discussion. In McGowan v. Cityof Los Angeles, 100 Cal.App.2d 386, 223 P.2d 862, 21 A.L.R.2d 1206, 1211 (1950), a California District Court held the results of a blood alcohol test inadmissible by writing:
 "We assume, although neither the paper which was marked for identification nor the bottle which was not offered is before us, that the paper states the analysis showed a concentration of .16% alcohol in the contents of the bottle.
 "Section 1920 reads: `Entries in public or other official books or records, made in the performance of his duty by a public officer of this state, or by another person in the performance of a duty specially enjoined by law are prima facie evidence of the facts stated therein.' If it had been proved that the blood analyzed by the county coroner's office had been taken from the body of Cox before any extraneous matter had been injected into his body, the coroner's record of the analysis would have been admissible and *Page 862 prima facie evidence of the facts therein stated."
[Emphasis added]
We conclude that while a copy of an accused's hospital records in Alabama is admissible in criminal prosecutions, see Annot., 69 A.L.R.3d 22 (1976), and can relate to the intoxication of patients where a proper foundation is laid, see Annot., 80 A.L.R.3d 456 (1977), a hospital record cannot render evidence admissible which would otherwise be inadmissible.
The results of Mr. Baines' test played an extremely important part in the State's burden of proving the requisite degree of reckless conduct necessary to support a conviction for murder. The evidence of intoxication was conflicting and, under the circumstances, the result of the test was extremely prejudicial to the appellant. Commander, 374 So.2d at 917. This error in proving the chain of custody for the blood sample violated fundamental rules of evidence and requires that the judgment of conviction be reversed.
REVERSED AND REMANDED.
All the Judges concur.
[1] Repealed by Acts 1980, No. 80-434, § 15-106, effective May 19, 1980. Replaced by Ala. Code § 32-5A-194 (Supp. 1980).
[2] Now Justice Almon of the Alabama Supreme Court.