Harmon Glenn McDaniel was indicted for the offense of criminally negligent homicide in violation of § 13A-6-4, Code of Alabama (1975). The appellant did not request a trial by jury and the evidence was presented to the trial court ore tenus. He was found guilty and sentenced to 330 days confinement in the Madison County Jail and fined $2,000.00.
Dino DeWayne Wynn testified that on Saturday, April 13, 1985, he was driving a white Z-28 automobile up Monte Sano Mountain on Governor's Drive in Huntsville, Alabama, at which point he was involved in an automobile accident. His car was in the left hand lane of the four lane highway. In front of him was a Corvette. He saw another Corvette, which was traveling in the opposite direction, swerve out of its lane and collide into the Corvette in front of him. Wynn collided with the car in front of him, damaging the left side of the car which he was driving.
The driver of the Corvette which was in front of Wynn after the collision had occurred was not killed in the accident. Following the initial collision between the two *Page 362 
Corvettes, the Corvette which was in front of Wynn was struck by a red Firebird automobile which had been traveling in the same direction as Wynn but was in the right hand lane of the highway. The Corvette which was in front of Wynn (Hightower) did not leave the lane it was traveling in until it was struck by the other Corvette. Wynn indicated that the man killed in the accident was in the Corvette which had been coming down the mountain and had swerved out of his lane, hitting the other Corvette in front of Wynn's vehicle.
Jeffery Michael Ray testified that he had been driving the red Firebird up the mountain in the right hand lane just before the accident occurred. He admitted that he had been racing with the Z-28 vehicle driven by Wynn in the left hand lane. He saw a white Corvette, driven by David Hightower, who was killed in the accident, traveling up the mountain in the left hand lane. A silver Corvette collided into the white Corvette and, following the collision, his car struck the white Corvette. He was traveling approximately 30 or 40 miles per hour when he hit the white Corvette. The damage estimate on his car was $4,000.00.
Peter Thomas Roth, a passenger in Ray's Firebird, testified that the car that he was in was in the left hand lane several car lengths behind the collision. He testified that the white Corvette did not cross over into the oncoming traffic in the other lane. The silver Corvette burst into flames following the collision. He saw the driver of the silver Corvette leave the car and run to the side of the road. David Hightower was trapped in the white Corvette, following the collision, and could not be helped.
Dr. Clement Patrick Cotter testified that he was the surgeon on call at the Huntsville Hospital on the night of April 13, 1985. He was called to the emergency room that night and arrived there at 11:52 p.m. He pronounced David Hightower dead and signed his death certificate. The cause of death was "multiple massive crushing injuries with shock." There appeared to be more injuries on the left side of Hightower's body.
Carolyn Heacox, a plebotomy technician at the Huntsville Hospital, testified that she took a blood sample from the appellant. Taking blood samples from patients and delivering them to the lab was her job and she was trained for this position at the hospital. Ms. Heacox testified that all patients in the emergency room at the hospital are given identification numbers. When she took the sample from the appellant, she placed it in a vial and transferred his identification number onto the vial. She placed her initials on the vial and them delivered it to the chemistry department at the hospital. This occurred on April 13, 1985.
Albert Lawrence Haynes testified that he was the eleven to seven supervisor at the Huntsville laboratory and had been working there for 15 years. He was trained as a medical technologist. Haynes performed a blood-alcohol test on the appellant's blood sample. The vial of blood had the appellant's identification number on it when Haynes received it.
The test for blood alcohol content was made on an automated chemical analysis machine. The results, admitted over the appellant's objection, showed his blood alcohol level to be .102. The blood sample was taken at 11:50 p.m. on the night in question.
Haynes testified that controls were run on the machine every day to insure that the results are accurate. The machine was operating in a satisfactory manner prior to being used to test the appellant's blood. Haynes testified that the machine was a scientifically accepted method for determining blood alcohol and that tests conducted on that particular machine are reasonably expected to produce accurate results.
Jonathan Allen Fague, a passenger in Ray's Firebird when the accident occurred, testified that he saw the white Corvette after the collision had occurred while it was spinning around in the left hand lane of the highway. The point of impact between the two Corvettes was in the lane in which the white Corvette was originally traveling. Fague saw brake lights on the white Corvette *Page 363 
flash on immediately before the accident occurred.
Officer Willie Culver, a Huntsville policeman who was on the scene, testified that he spoke with the appellant for about one minute following the accident. He detected the odor of an alcoholic beverage near the appellant. Appellant's eyes appeared bloodshot and he had cuts on his face. Officer Culver was on the scene for about four minutes before the appellant was taken away by the ambulance.
Edward E. Litkenhous, a pathologist and the Medical Director of the Huntsville Hospital Laboratory, testified concerning the Automated Chemical Analysis Machine used to test the appellant's blood for alcohol. He explained the actual chemical processes involved once each sample is put into the machine. He verified that the machine was a widely accepted scientific tool for blood-alcohol tests and had been in use at the hospital for about 10 or 11 years. He stated that in using the machine one could reasonably expect to produce results which would be accurate and reliable.
Dr. Litkenhous was not involved with the testing of the appellant's blood and was not aware of the methods used in drawing the blood or running the test in this particular case. He testified that Mr. Haynes, the person who performed the test on the appellant's blood, was "eminently qualified" to do so and was familiar with the standard procedures for running tests on the machine at issue.
Dr. Litkenhous also verified Ms. Heacox's qualifications regarding the taking of the blood samples. He stated that, if an average person's blood alcohol level was between .05 and .10 percent, there would be a slight amount of physical impairment.
Officer Brent Thatcher of the Huntsville Police Department testified that he was present at the scene of the accident and observed that all of the skid marks on the surface of the road where the accident occurred were located in the eastbound lane. He spoke with the appellant following the accident and the appellant told him that he thought that he had fallen asleep at the wheel and remembered being drowsy and nodding off a couple of times while driving. The appellant told him that he did not remember the impact. The appellant told him he had been out to eat in Albertville, Alabama, just prior to the accident and that he had been playing golf all that day. The appellant told Thatcher that he had not applied his brakes before hitting the other automobile.
Thatcher testified that the appellant had been very cooperative and did not appear to be under the influence of alcohol. He did not smell any alcohol about the appellant's person.
The evidence presented by the appellant tended to show that at approximately 8:15 a.m. on the day of the accident, April 13, 1985, the appellant arrived at the house of his brother, Larry Joe McDaniel, to pick him up to play golf. They then drove to their brother-in-law's house, picked him up and left for the golf course. Before beginning to play golf, they stopped at a service station and purchased two six-packs of beer. The appellant and his brother-in-law drank all but three of the beers. They played 18 holes of golf, finishing around 3:00 p.m., and then played nine more, finishing around 5:00 p.m. No one had any alcoholic beverages between the time they finished the 12th hole of the first 18 holes and when they left to go home.
On the way home they purchased another six pack of beer. The appellant drank two of these between the time they were purchased and when he left from his brother's house around 7:00 p.m. to eat supper.
The appellant ate a full meal and was still eating when his brother left him at the restaurant around 8:30 p.m. The appellant testified that he left the restaurant at approximately 9:15 p.m. and then drove to Guntersville to look for another of his brothers. The appellant left Guntersville around 9:30 p.m. and drove to Huntsville on Highway 431.
Several witnesses testified concerning appellant's excellent reputation.
A couple, Mr. and Mrs. Parks, who lived in Mulberry, Tennessee at the time of trial, testified that they had been traveling east *Page 364 
on Governor's Drive on the night of the accident and had stopped to give assistance. Mr. and Mrs. Parks were in close proximity to the appellant until the ambulance removed him from the scene. They both testified that they did not smell alcohol about the appellant's person, nor did the appellant appear to be under the influence of alcohol. Neither Mr. or Mrs. Parks had ever seen the appellant prior to the night of the accident. They did not know him and were not related to him.
 I
The appellant contends that the trial court committed reversible error by allowing the results of the blood alcohol test into evidence. We disagree.
The appellant argues that this evidence should not have been admitted because the proper predicate was not laid. He bases his argument on Patton v. City of Decatur, 337 So.2d 321 (Ala. 1976).
The Alabama Supreme Court strictly interpreted the predecessor to § 32-5A-194, Code of Alabama (1975), requiring that tests such as these must be shown to have been performed according to methods approved by the State Board of Health before the results of such tests may be admitted into evidence.Patton, supra. See also Bush v. City of Troy, 474 So.2d 164
(Ala.Crim.App. 1984), aff'd, 474 So.2d 168 (Ala. 1985).
While it is apparent from the record in this case that the proper predicate under the Statute was not laid, reversal is not automatically required in this instance.
 "[I]f a party wishes to have the results of a blood alcohol test admitted into evidence he has two choices; either he must show that the tests were taken in conformity with [the statute], or he must lay the proper foundation for their admission under general evidence principles. The admission of blood alcohol test results for which neither of these procedures is followed results in reversible error." (Citations omitted).
Whetstone v. State, 407 So.2d 854, 857 (Ala.Crim.App. 1981). See Moore v. State, 442 So.2d 164 (Ala.Crim.App. 1983); Gwinv. State, 425 So.2d 500 (Ala.Crim.App. 1982), writ quashed,425 So.2d 510 (Ala. 1983); Kent v. Singleton, 457 So.2d 356
(Ala. 1984); McGough v. Slaughter, 395 So.2d 972 (Ala. 1981).
The elements of the proper predicate necessary for the admission of blood alcohol or other similar scientific test results under general evidence principles have been stated in various ways. For example, in Whetstone, supra, we stated:
 "[I]t was necessary for the State to establish that procedures were followed which would insure the reliability of the test results. In order for the test results to be reliable, and thus relevant to the matter at issue, the results must be from generally accepted tests conducted under conditions which do not impeach the reliability of the testing procedure." (emphasis added)
Whetstone, supra p. 857 (citing McGough, supra p. 977). In addition, "it must be shown that there was no break in the chain of custody. Identification and continuity of possession must be sufficiently established to afford ample assurance of the authenticity of the item." Whetstone, supra p. 859, and cases cited therein.
In Moore, supra, we stated with reference to a photoelectric intoximeter test:
 "To establish a predicate for admitting the test results, without reliance on the statute, there should be evidence that:
 "(1) the theory underlying the photoelectric intoximeter test is valid and generally accepted as such;
 "(2) the intoximeter is a reliable instrument and generally accepted as such;
 "(3) the intoximeter test was administered by a qualified individual who could properly conduct the test and interpret the results, and
 "(4) the instrument used in conducting the test was in good working condition and the test was conducted in such a manner as to secure accurate results.
Moore, supra p. 167 (citing E. Imwinkelried, EvidentiaryFoundations, p. 92 (1980)). *Page 365 
More recently, the Alabama Supreme Court has stated:
 "While we find no Alabama cases which specifically outline all the requisite elements of a predicate for the admission of scientific test results, it is generally held that such a predicate must show that the circumstances of the taking of the sample, the identification, maintenance, and transporting of it, and the testing itself are scientifically acceptable and reasonably expected to produce results which are accurate and reliable. See, e.g. 29 AmJur.2d. Evidence, 830 (1967) 432 So.2d [at] 1277."
Kent, supra p. 359 (quoting from Aycock v. Martinez,432 So.2d 1274 (Ala. 1983)).
After a thorough examination of the record in this case, we conclude that the foundation was sufficient under general evidence principles for the admission of the test results in this cause.
However, even had we found the foundation for the admittance of the test results to have been insufficient, the erroneous admission of the test results would not require a reversal in this case.
It is clear from the record that the trial judge's ruling was not based on the results of the blood test. He clearly indicated that the uncontroverted fact that the appellanthad been drinking earlier in the day in combination with the uncontroverted fact that the appellant was aware that he was tired and sleepy and continued to drive the automobile formed basis of his ruling. (R. 304). The appellant was, therefore, not unduly prejudiced by the admission of the evidence. A.R.A.P. 45. See Gwin, supra.
 II
The appellant contends that the evidence presented in this case was insufficient to sustain his conviction for criminally negligent homicide. We disagree.
Section 13A-6-4, Code of Alabama (1975) provides in pertinent part: "(a) A person commits the crime of criminally negligent homicide if he causes the death of another person by criminal negligence." Criminal negligence has been defined as the failure "to perceive a substantial and unjustifiable risk that the result will occur. . . ." Section 13A-2-2(4), Code of Alabama (1975), as amended.
 "In the present case, the defendant waived his right to a jury trial. Thus, this court must adhere to the general rule that the judgment of a trial court upon evidence taken ore tenus will not be disturbed on appeal unless such judgment is plainly contrary to the weight of the evidence. Messelt v. State, 351 So.2d 640, 641 (Ala.Cr.App.), cert. denied, 351 So.2d 642 (Ala. 1977). Mosely v. State, 53 Ala. App. 272, 299 So.2d 317 (1974), cert. denied, 292 Ala. 743, 299 So.2d 319 (1974). This rule has been stated as follows:
 " 'In non-jury cases, the judgment of the trial court, when based on testimony ore tenus, will be affirmed unless the judgment was clearly wrong or so contrary to the weight of the evidence as to be manifestly injust' (Citations omitted). Duncan v. State, 456 So.2d 359 (Ala.Cr.App. 1983), affirmed, 456 So.2d 362 (Ala. 1984)."
Todd v. State, 472 So.2d 707 (Ala.Crim.App. 1985).
The trial court's judgment in the case at bar cannot be said to be clearly contrary to the weight of evidence. Evidence was presented by the State which tended to show that the appellant in this case continued to drive his car knowing that he was tired and sleepy. Indeed, this uncontroverted testimony wasmore than sufficient to support the appellant's conviction of criminally negligent homicide since proof of actual knowledge of the risk is not necessary. Phelps v. State, 435 So.2d 158
(Ala.Crim.App. 1983).
The appellant argues specifically that the State failed to prove that the appellant's role in the collision was the proximate cause of David Hightower's death. This argument is without merit. Through photographs and other testimony concerning the damages and injuries suffered by the respective persons involved in the accident, it could be reasonably inferred that the appellant's actions resulted in David *Page 366 
Hightower's death. Cumbo v. State, 368 So.2d 871
(Ala.Crim.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979) and authorities cited therein.
For the above-stated reasons, this cause is due to be and is, hereby, affirmed.
AFFIRMED.
All the Judges concur.