The appellant was indicted for the murder of Earl Ray McCrory, the murder of Philip Frazier Mills Jr., the first degree assault of James Edward Mills, and the first degree assault of Leon Wayne Mills, The State filed a motion to consolidate the four charges for trial, and the motion was granted. The appellant was convicted of all four offenses and was sentenced to 20 years' imprisonment in each case. The sentences were ordered to run concurrently in all cases.
The record indicates that, on February 3, 1989, James Mills, who was 17 years old, had gone with his family to a Mardi Gras parade in Mobile and returned home. He then drove his younger brothers, who were aged 9 and 12 at the time, and his cousin, who was 10 years old, to a McDonald's restaurant. As they were driving home, he stopped the car in order to make a left turn. The appellant, who was driving a white Lincoln Continental automobile, approached Mills's vehicle at an extremely high rate of speed and hit it, causing it to burst into flames. Corporal Hearn, of the Mobile Police Department, testified that the posted speed limit at the intersection was 35 miles an hour; however, based on his experience and schooling, he expressed the opinion that the appellant's car was traveling at 101.34 miles per hour when it hit the victims' vehicle. Several eyewitnesses testified that the appellant took no evasive action to avoid hitting the victims' vehicle; however, the appellant testified that he attempted to brake just prior to impact.
Dr. Arnold Luterman, the director of the University of South Alabama Burn Center and professor of surgery at the University of South Alabama College of Medicine, testified that he was treating both James Mills and his brother, Leon Wayne Mills, who had both survived the crash. He stated that James had suffered severe burn injuries over approximately 11% of his total body surface area, had severe inhalation injuries from inhaling the smoke, and had suffered multiple contusions. He testified that James Mills's lungs had required extensive *Page 338 
respiratory support and that he was on a ventilator for nearly a month. He had also suffered multiple episodes of infections in his lungs and required major surgery. He would further require years of reconstructive surgery, nutritional support, physical therapy, and pain control therapy. Dr. Luterman testified that Leon Wayne Mills sustained burns over 20% of his body, but that the burns were not as severe as his older brother's burns. He had suffered inhalation injury and would have to remain under supervision and care at the Burn Center for a number of years to monitor both physical injuries and possible psychological damage.
Dr. Leroy Reddick, a forensic pathologist, testified that he performed the autopsies on Philip Frazier Mills, Jr., the third brother, and Earl Ray McCrory, their cousin. He testified that McCrory's body had been severely burned and was charred on most of the external area. An internal examination indicated that McCrory's head had been separated from the cervical spine and that he had died almost instantaneously. Philip Frazier Mills's body was also severely charred externally. Internal examination indicated head injuries and sudden death. He had also sustained multiple fractured ribs, a contused lung, and a fracture of the right femur. Dr. Reddick testified that, based upon his experience, the type of injuries which caused the death of these two victims were of a kind generally seen in a motor vehicle crash, generally involving a heavy vehicle or excessive speed.
There was testimony that the appellant had drunk two beers prior to the crash and that a blood sample taken at the University of South Alabama Hospital from the appellant was tested for blood alcohol content by the Dupont Automatic Chemical Analyzer. There was testimony that this instrument had not yet been certified in Alabama, but was widely being used in the scientific community. The results of this testing indicated that the appellant's blood contained .12% alcohol.
The appellant testified that he had drunk two beers at the Mardi Gras parade prior to the offense. He testified that, following the parade, he and his wife went home and that he left his house approximately 20 minutes later to go to a store to buy some beer. He testified that he purchased a six-pack and an eight-pack of beer. He further stated that, during the drive home, he came upon a truck, which pulled in front of him and began stopping and starting, by tapping on the brakes, as they approached the four-way stop. The appellant testified that he decided to pass the truck and, as he had attempted to do so, the truck had sped up and cut off his opportunity to pass. He testified he was subsequently able to pass the truck and a Mustang vehicle that was ahead of both of them, but that the truck remained in close pursuit. He testified that he began to accelerate to escape the truck, but had no recollection of the speed at which he was traveling and only vaguely recalled the collision.
 I
The appellant argues that the trial court erred in admitting the results of his blood alcohol test, because, he says, the State failed to prove an unbroken chain of custody of the blood sample. Specifically, the appellant argued that there was a break in the chain of custody after a nurse, Mary Ann Hood, drew the blood and transported it to the ward clerk, and before it was picked up from the ward clerk's basket by Yolonda Moody, who transported it to the lab. The appellant argues that, because the State did not present evidence as to who the ward clerk was or that she maintained the reliability of the blood sample until it was picked up by Yolonda Moody, the State did not present an unbroken chain of custody. However, Mary Ann Hood testified that she labelled the sample with the appellant's name and other pertinent information and placed the blood sample in a pre-vacuum sealed vial. Thereafter, Ed Senteno, who received the sample in the lab, testified that, based upon the documentation, the sample could not have been altered or adulterated, because it was received in a pre-vacuum vial, and that it would not have been accepted if it had not still been sealed. *Page 339 
"To establish a sufficient predicate for admission into evidence it must be shown that there was no break in the chain of custody. Identification and continuity of possession must be sufficiently established to afford ample assurance of the authenticity of the item. Ex parte Yarber, 375 So.2d 1231, 1234
(Ala. 1979). 'A party need not negative the remotest possibility of substitution, alteration or tampering with the evidence.' Mauldin v. State, Ala.Cr.App., 402 So.2d 1106
(1981); Lynn v. State, Ala.Cr.App., 380 So.2d 366 (1980);Murrell v. State, Ala.Cr.App., 377 So.2d 1102, cert. denied,377 So.2d 1108 (Ala. 1979).
"In Sexton v. State, Ala.Cr.App., 346 So.2d 1177, 1180, cert. denied, 346 So.2d 1180, we find:
 " 'To warrant the reception of an object in evidence against an objection than an unbroken chain of custody has not been shown, it is not necessary that it be proved to an absolute certainty but only to a reasonable probability, that the object is the same as, and not substantially different from, the object as it existed at the commencement of the chain.' "
Whetstone v. State, 407 So.2d 854, 859 (Ala.Cr.App. 1981). (Emphasis in original.) See also Powell v. State,515 So.2d 140, 144 (Ala.Cr.App. 1986) (wherein the appellant contended that there were missing links in the chain of custody of his blood test results; however, the State proved that the procedures followed would have insured the reliability of the results). In the present case, the State sufficiently proved the chain of custody of the appellant's blood sample, so as to ensure the reliability of the test results.
 II
The appellant argues that the trial court erred in prohibiting him from attacking the credibility of the chain of custody of the blood sample. Specifically, the appellant argues that he should have been allowed to present the testimony of Susan Delaney, a ward clerk at the emergency room.
After the trial court had ruled that the chain of custody was sufficient, and, indeed, after the State had presented its entire case, and during the appellant's presentation of his defense, defense counsel sought to present the testimony of Susan Delaney that she did not know who was covering the ward clerk's desk or who would have received the blood sample from Mary Ann Hood. The record indicates that the following transpired during the appellant's examination of Susan Delaney:
 "[Prosecutor]: Excuse me, Mr. Massey. We would respectfully object on the grounds that all of this was covered through . . . chain of custody witnesses yesterday as it relates not in general, but to his particular case.
"THE COURT: That is correct.
 "[Defense counsel]: Judge, unfortunately, though, they didn't cover it completely and that's what we're going to show the Court.
"THE COURT: What?
 "[Prosecutor]: Whether or not we covered it completely is a matter of law and you have ruled.
 "THE COURT: There is no question it's been covered.
 "[Defense counsel]: All right. Do you mind if I continue with my questioning, please?
 "THE COURT: Well, you know I don't want you to be repetitious and go through the same thing. I ruled that the chain of custody — by the way, using your own case that you gave me was —
 [Defense counsel]: If it please the Court —
 "THE COURT: — as a matter of law sufficient. If you're trying to impeach that, no, I will not let you.
 "[Defense counsel]: We have proffered this witness, Judge, as a showing that the chain of custody was not followed. This lady is a part of that chain. She's going to give testimony. She's proffered as testifying to the fact that the chain of custody was not in fact followed. She was subpoenaed by the District Attorney's office and *Page 340 
was allowed to leave yesterday without participating in this procedure and we're —
"THE COURT: Go ahead.
"[Defense counsel]: Thank you.
 "THE COURT: Go ahead. When you get through I will rule on your motion.
"[Prosecutor]: Yes, sir.
"* * * *
 "Q [Defense counsel]: On this particular night were you on duty?
"A According to my schedule I was.
"Q Yes, ma'am?
 "A I don't remember everything that went on, but I do know I was there.
 "Q I understand. And you're testifying according to your recollection of the records; is that correct?
"A Uh-huh.
 "Q And as far as procedures on that particular night, if a sample of blood was collected by the emergency room nurse, Ms. Hood, who would it have been delivered to?
"A Whoever was covering the desk in my absence.
"Q All right. And do you know who that was?
"A I don't recall who that was.
 "Q Would it have been anyone that you have recognized?
 "A I don't remember who was covering the desk. I do know that when we get a lot of trauma in I have to leave my desk and go in the trauma room where the more critical area is. And anyone out there, whether it be a nurse or another nurse's assistant, are at liberty to cover the desk and that area. And procedures are always followed regardless of who's there at the desk.
 "Q And the procedures are to deliver the sample to the —
 "A To the desk. It doesn't always have to be a ward clerk, it's whoever that's covering in our absence.
"* * * *
 "[Prosecutor]: We — we would stipulate based on her constantly saying that she had no knowledge, that she had no knowledge.
"Q Is that your testimony?
"A Yes, sir.
 "[Prosecutor]: We would move with all due respect to this lady to strike her testimony on the simple ground that the integrity of the chain of custody is a question of law upon which this Court ruled yesterday. Ruling that the chain of custody was in fact consistent with the rules of law and that its integrity was not compromised.
 "THE COURT: That is correct and her testimony has not refuted that. Y'all have any other questions?
 "[Prosecutor]: I don't have anything to ask this lady.
"THE COURT: Thank you very much.
 "[Defense counsel]: Did you grant their motion to strike the testimony? "THE COURT: The jury's heard it, but if you know, technically you want me to grant their motion to strike it, I will.
"[Defense counsel]: We except."
It is well established that the trial court has broad discretion in determining the order of proof in a criminal prosecution. Holm v. State, 416 So.2d 782, 788
(Ala.Cr.App. 1982). Similarly, the order of rebuttal testimony rests largely in the sound discretion of the trial court. Webbv. State, 455 So.2d 223, 225 (Ala.Cr.App. 1984). " 'The time and manner of introducing and closing the evidence in a suit are necessarily within the judicial discretion of the presiding judge. . . .' " Scott v. State, 246 Ala. 545, 546,21 So.2d 703, 704 (1945), quoting 1 Brickell's Digest, p. 886, § 1174. We find no abuse of discretion by the trial court in its determination regarding when to close the evidence concerning the chain of custody, and, because the evidence offered by the appellant did not dispute the earlier testimony, we find no error in the trial court's striking that evidence. See Webb v. State, 455 So.2d 223, 225 (Ala.Cr.App. 1984) (" 'A trial court should not allow a state witness to be "recalled" by the defense during its case-in-chief for purposes of further cross-examination and impeachment on matters to which the witness had previously testified.' Walker v.State, *Page 341 416 So.2d 1083, 1091 (Ala.Crim.App. 1982"). Cf.Gilder v. State, 542 So.2d 1306, 1308 (Ala.Cr.App. 1988) ("The trial judge in his discretion may, before the close of the final arguments, allow a party to provide an omission in the chain of evidence").
 III
The appellant argues that the trial court erred in refusing his requested instruction to the jury on the lesser included offense of vehicular homicide. The appellant cites Ex parte Jordan, 486 So.2d 485 (Ala. 1986), in support of his argument. The State agrees, in its brief, that Ex parte Jordan is controlling in this case. In that case the Alabama Supreme Court held that, based on the facts of the case, the offense of vehicular homicide could constitute a lesser included offense of the charge of murder. According to the facts of the present case, and in light of the holding inEx parte Jordan, supra, vehicular homicide was a lesser included offense. However, on application for rehearing in Exparte Jordan, the Alabama Supreme Court held that, although the vehicular homicide was a lesser included offense under the fact situation presented in that case, it was harmless error to refuse the charge, because the trial court instructed the jury on the lesser included offenses of manslaughter and criminally negligent homicide, as well as on murder:
 "The trial court instructed the jury on murder and on the lesser included offenses of manslaughter and criminally negligent homicide. As lesser included offenses, these two offenses require a lesser kind of culpability to establish their commission. Manslaughter requires reckless conduct, where the actor is aware of and consciously disregards a substantial and unjustifiable risk that death will occur. Code 1975, §§ 13A-6-3, 13A-2-2(3). Criminally negligent homicide requires a failure to perceive such a substantial and unjustifiable risk, Code 1975, §§ 13A-6-4, 13A-2-2(4). Thus, on a continuum of culpability, these two offenses stand between murder and vehicular homicide.
 "Although the jury was given the opportunity to apply the elements of manslaughter and criminally negligent homicide to the facts of this case, the jury rejected these theories to reach a verdict of guilty on the greater offense of murder. Therefore, we must logically conclude that an instruction on vehicular homicide, although proper, would not have affected the outcome of this case. See State v. Nowlin, 244 N.W.2d 591
(Iowa 1976) (no prejudice resulted where court instructed jury on first and second-degree murder but not on lesser included offense of manslaughter and verdict for first-degree murder was returned); Wilcox v. State, 299 So.2d 48 (Fla.Dist.Ct.App. 1974) (failure to instruct on lesser included offense of assault was harmless error where verdict of guilty of robbery was returned after instructions were given on four other lesser included offenses)."
Ex parte Jordan, supra, at 488-89.
In the present case, the jury was charged on the lesser included offenses of manslaughter and criminally negligent homicide, as well as murder, and it rejected these offenses, finding the appellant guilty of murder. Thus, as in Ex parteJordan, supra, the trial court's failure to charge the jury on vehicular homicide as a lesser included offense constituted harmless error.
 IV
The appellant argues that the trial court erred in allowing the State to question him about his prior convictions for traffic offenses. The record indicates that the prosecutor introduced four traffic tickets issued to the appellant for the expressed purpose of showing "the requisite state of mind as it is alleged in the indictment — to-wit: both recklessness and indifference to human life." The appellant argues that by cross-examining him on the disposition of these prior traffic offenses, the prosecutor used an improper method of impeachment, because the convictions did not involve crimes of moral turpitude.
However, because this matter was never brought to the attention of the trial court *Page 342 
by any form of objection, it is now waived for purposes of appeal. See Dixon v. State, 476 So.2d 1236 (Ala.Cr.App. 1985);Robinson v. State, 428 So.2d 167 (Ala.Cr.App. 1982).
 V
The appellant argues that the trial court erred in instructing the jury on the statutory presumption concerning a person's being under the influence of alcohol. The appellant argues that the indictments did not specify whether the State "was traveling" under § 32-5A-191(a)(1), Code of Alabama 1975, or § 32-5A-191(a)(2), when charging that the appellant operated a motor vehicle "while under the influence of alcohol." He argues that the indictment seems to indicate that the State was proceeding pursuant to § 32-5A-191(a)(2), in proving its case and, therefore, that the State could not rely on the rebuttable presumption.
However, the appellant was not charged with driving under the influence; rather, the indictments charged the appellant with murder and assault in the first degree. The language in the indictments stating that the appellant was "under the influence of alcohol" and "in excess of the posted speed limit" was included as a description of the facts under which the appellant committed the charged offenses. Specifically, the appellant was charged on the murder indictments that he:
 "[D]id, under circumstances manifesting extreme indifference to human life, recklessly engage in conduct which created a grave risk of death to a person other than himself, and thereby caused the death of another person, to-wit: on or about February 3, 1989, the said ROBERT BARTLETT did operate a motor vehicle on a roadway in Mobile County while under the influence of alcohol and in excess of the posted speed limit thereby ramming the vehicle he was driving into a vehicle in which [the victim] was a passenger which thereby caused the death of [the victim], in violation of § 13A-6-2 of the Code of Alabama."
The indictments that charged him with assault in the first degree charged that he:
 "[D]id under circumstances manifesting extreme indifference to human life, recklessly engage in conduct which created a grave risk of death to a person other than himself, and thereby caused serious physical injury to another person, to-wit: on or about February 3, 1989, the said ROBERT BARTLETT did operate a motor vehicle on a roadway in Mobile County while under the influence of alcohol and in excess of the posted speed limit thereby ramming the vehicle he was driving into a vehicle in which [the victim] was a passenger which thereby caused serious physical injury to [the victim], in violation of § 13A-6-20 of the Code of Alabama."
Moreover, the prosecution provided proof that the appellant was driving under the influence when he committed the charged offenses. Section 32-5A-191 defines the single offense of driving under the influence; however, it provides alternative methods of proving that offense. Sisson v. State,528 So.2d 1159 (Ala. 1988). The State could prove this factual allegation using either subsection.
The appellant also argues that, even if the State could proceed under either of the subsections, it was not entitled to the presumption because its witness did not testify that the appellant had 0.10% or more by "weight of alcohol," but, rather, that he had such a percentage by "volume." The appellant fails to cite any authority in support of his argument. However, any error in the witness's use of the term "volume" in defining the legal level of intoxication in the State of Alabama and in giving his findings from the appellant's blood sample is harmless. The State presented the testimony of numerous witnesses that the appellant appeared to be under influence of alcohol. The appellant admitted to having had a couple of beers prior to the offense. There is no indication in the record that this matter "has probably injuriously affected substantial rights *Page 343 
of" the appellant. Rule 45, Alabama Rules of Appellate Procedure.
AFFIRMED.
All Judges concur.