Daryl Dean Moorman was convicted for the criminally negligent homicide of Willie C. Luke, Sr., and was sentenced to eight years' imprisonment. He raises two issues on this appeal from that conviction.
 I
This conviction grew out of a vehicular homicide. Following the collision, the injured defendant was taken to the East Alabama Medical Center, where a chemical test of his blood revealed a blood-alcohol level of .298%. The defendant argues that the blood test results were inadmissible because the State failed to prove a proper chain of custody of the blood sample and failed to prove the reliability of the test instrument employed.
 A. Chain of Custody
The deputy coroner of Lee County pronounced Mr. Luke dead at the scene of the accident at 3:25 on the afternoon of November 23, 1988. The injured defendant was taken to the East Alabama Medical Center. Wanda Johnson, a registered nurse on duty in the emergency room, testified that between 3:30 and 4:00 that afternoon she simultaneously drew at least three blood samples from the defendant for "diagnostic purposes" and for "legal purposes." Each sample was placed in a prepackaged tube and each tube had a different colored top. Nurse Johnson did not testify that the sample she sent to the laboratory had a purple top. She did testify that she sealed each tube and identified each sample with the defendant's name and the hospital number. She then gave one sample to Opelika police detective John Richardson. She gave the other samples to the "unit secretary to be sent to the lab." She testified that "[s]omebody from the lab picked it up." Johnson testified that tests for the emergency room were "automatically done stat [as soon as possible]." Neither the unit secretary nor the person from the laboratory who picked up the sample testified at trial.
Jane Trip was the "toxicology coordinator" for the hospital laboratory. She was *Page 955 
"in charge of all the drugs of abuse testing," "responsible for all the therapeutic drug monitoring . . . run at the hospital," and was "also in charge of all the toxicology drugs [including ethanol alcohol] . . . run at the hospital." She tested the one sample of the defendant's blood she received from "laboratory personnel." This sample had a red and grey speckled top and appeared to be "intact." She testified that the information on the sample container indicated that the sample had been taken at 3:30 p.m. Although she did not indicate the exact time she received the sample, she testified that she "usually receive[d] the samples [from the emergency room] between 5 and 10 minutes after they're collected." She completed her analysis of the sample at 4:15 p.m.
The prosecution did not attempt to introduce the results of the defendant's blood-alcohol test under Alabama's implied consent statute, Ala. Code 1975, § 32-5-192, and its counterpart, § 32-5-194, see Ex parte Bush,474 So.2d 168 (Ala. 1985), but did so under general evidence principles, Whetstone v. State, 407 So.2d 854, 857
(Ala.Cr.App. 1981).
In Suttle v. State, 565 So.2d 1197 (Ala.Cr.App. 1990), a conviction for vehicular homicide was reversed because the State failed to account for the whereabouts of the blood samples taken from the accused during the four days between the time the samples were taken by a nurse and the time they were received by the State's forensic expert.
 "The principles governing this issue were set forth in Ex parte Williams, 548 So.2d 518, 520 (Ala. 1989):
 " 'The purpose of the establishment of the chain of custody is announced in Ex parte Williams, 505 So.2d 1254 (Ala. 1987):
 " ' "The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence. Williams v. State, 375 So.2d 1257 (Ala.Cr.App.), cert. denied, 375 So.2d 1271 (Ala. 1979); Tate v. State, 435 So.2d 190 (Ala.Cr.App. 1983); Smith v. State, 446 So.2d 68
(Ala.Cr.App. 1984). 'The evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain.' Slaughter v. State, 411 So.2d 819, 822 (Ala.Cr.App. 1981) (emphasis supplied)."
" '505 So.2d at 1255.
 " 'A showing that there was no break in the chain of custody is required to establish a sufficient predicate for admission into evidence. Ex parte Yarber, 375 So.2d 1231 (Ala. 1979), reversed on other grounds, 437 So.2d 1330 (Ala. 1983). The identification of the evidence and continuity of possession must be sufficiently established in order to assure the authenticity of the item, Ex parte Yarber, supra.
 " 'This state employs two separate standards for testing the chain of custody — the weak link test announced in Sommer v. State, 489 So.2d 643 (Ala.Crim.App. 1986), and the missing link test announced in Mauldin v. State, 402 So.2d 1106 (Ala.Crim.App. 1981).
 " 'Where a weak link in the chain of custody is found, the weight and credit afforded the evidence, rather than its admissibility, is questioned. Sommer, supra. Where a break in the chain of custody, or a "missing link" in the chain of custody is shown, the admissibility of the evidence is questioned, Mauldin, supra.'
 "With regard to specimens taken from the human body, it is also incumbent upon the prosecution to show that the specimen analyzed was in fact the specimen taken from the defendant. In such cases, '[t]he "chain of custody" involves "the necessity of proving where and by whom the specimen was kept and through whose hands it passed." J. Richardson, Modern Scientific Evidence, Section 13.14a (2d ed. 1974).' Gothard v. State, 452 So.2d 889, 890 (Ala.Cr.App.), cert. stricken, *Page 956 
 450 So.2d 479 (Ala. 1984). See generally, A. Moenssens, F. Inbau J. Starrs, Scientific Evidence in Criminal Cases § 1.18(2)(c) (3d ed. 1986). '[W]here the substance analyzed has passed through several hands the evidence must not leave it to conjecture as to who had it and what was done with it between the taking and the analysis.' Rodgers v. Commonwealth, 197 Va. 527, 90 S.E.2d 257, 260 (1955) (emphasis added)."
Suttle, 565 So.2d at 1198-99.
Despite the facts that two "links" in the chain of custody did not testify and were only generally identified as a unit secretary and a person from the laboratory, we find no "break" in the chain of custody of the blood sample. The evidence and the totality of the circumstances in this case establish a reasonable probability of the identity of the blood sample and the integrity of the continuity of possession.
 "For the few moments that the evidence was within the purview of the medical staff who did not testify to their parts in the chain of custody, there was only the remotest possibility of substitution, alteration, or tampering. Evidence momentarily unattended in a hospital setting to which only medical personnel have access is admissible, if otherwise sufficiently authenticated. See McIntosh v. State, 443 So.2d 1275 [Ala.Cr.App.], reversed on other grounds, 443 So.2d 1283 (Ala. 1983) (slide delivered to lab reception area and momentarily unattended admissible); Baynes v. State, 423 So.2d 307, 311 (Ala.Cr.App. 1982) (panties thrown by rape prosecutrix into clothes hamper, and rape kit unattended for hours in hospital both admissible over chain of custody objection)."
Reese v. State, 549 So.2d 148, 153 (Ala.Cr.App. 1989) (clothing of injured police officers which had been removed by medical personnel in officers' separate hospital rooms, dropped on the floor, and later retrieved by other officers stationed outside the rooms was admissible). See also Jackson v.State, 516 So.2d 726, 751-52 (Ala.Cr.App. 1985), remanded on other grounds, 516 So.2d 768 (Ala. 1986) (forensic serologist was properly allowed to testify to the results of blood tests, even though the person who delivered the blood samples to the serologist did not testify); Miller v.State, 484 So.2d 1203, 1204-05 (Ala.Cr.App. 1986) ("[a]ppellate courts have 'consistently' rejected the argument that the 'failure of the evidence to follow a specimen through the mails every step of the way to the chemist's laboratory should be the basis for rejection of chemical test evidence' when the proof shows the specimen was placed in the proper type of sealed container so that the possibility of contamination during transit was eliminated); Blackmon v. State,487 So.2d 1022, 1024 (Ala.Cr.App. 1986) (where examining physician placed sealed rape kit in secured refrigerated area in hospital and an officer picked up the kit at the hospital later the same day, testimony concerning the test results as admissible);Oury v. State, 53 Ala. App. 240, 243, 298 So.2d 661,663 (1974) (failure of toxicologist to testify that he delivered drug to subordinate for analysis did not establish break in chain of custody of drug); Powell v. State,47 Ala. App. 582, 585, 258 So.2d 923, 925 (1972) (there was no missing link in the chain of custody where the officer testified that he delivered the drugs in a sealed package to the department of toxicology and the forensic toxicologist testified that he received the package in a sealed condition, even though there was no testimony of who gave the package to the toxicologist).
 "The principles governing chain of custody challenges were outlined in United States v. Lane, 591 F.2d 961 (D.C. Cir. 1979), as follows:
 " 'Tangible evidence of crime is admissible when shown to be "in substantially the same condition as when the crime was committed." And it is to be presumed that the integrity of evidence routinely handled by governmental officials was suitably preserved "[unless the accused makes] a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering." If, however, that condition is met, the Government must establish that acceptable precautions were taken *Page 957 
to maintain the evidence in its original state.
 " 'The undertaking on that score need not rule out every conceivable chance that somehow the identity or character of the evidence underwent change. "[T]he possibility of misidentification and adulteration must be eliminated," we have said, "not absolutely, but as a matter of reasonable probability." So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in the light of surrounding circumstances.'"
United States v. Roberts, 844 F.2d 537, 549-50 (8th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534,102 L.Ed.2d 565 (1988), quoting United States v. Anderson,654 F.2d 1264, 1267 (8th Cir.), cert. denied, 454 U.S. 1127,102 S.Ct. 978, 71 L.Ed.2d 115 (1981). "[R]eal evidence is not [in]admissible because one can conjure up hypothetical possibilities that tampering occurred." United States v.Haldeman, 559 F.2d 31, 109 (D.C. Cir. 1976), cert. denied,431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). "If the trial court is satisfied that in reasonable probability the article has not been changed in any important respect, it may permit its introduction into evidence." United States v.McCowan, 706 F.2d 863, 865 (8th Cir. 1983). "Although the ideal practice would be for one person to maintain exclusive and constant control of the [evidence], these rules are made for practical people who deal with such evidence as part of day to day routine. The chain of custody requirements aim at a 'reasonable probability' that there has been no tampering; they are not intended as an obstacle course or a walk through a legalistic mine field." Blanco v. State,485 So.2d 1217, 1220 (Ala.Cr.App. 1986).
 B. The Test Instrument
The defendant also argues that the State failed to "verify the underlying test validity of the instrument used" to test the defendant's blood. Appellant's brief at 7.
 "The elements of the proper predicate necessary for the admission of blood alcohol or other similar scientific test results under general evidence principles have been stated in various ways. For example, in Whetstone
[v. State, 407 So.2d 854 (Ala.Cr.App. 1981)], we stated:
 " '[I]t was necessary for the State to establish that procedures were followed which would insure the reliability of the test results. In order for the test results to be reliable, and thus relevant to the matter at issue, the results must be from generally accepted tests conducted under conditions which do not impeach the reliability of the testing procedure.' (Emphasis added.)
 "Whetstone, supra p. 857 (citing McGough [v. Slaughter, 395 So.2d 972, 977 (Ala. 1981)]). In addition, 'it must be shown that there was no break in the chain of custody. Identification and continuity of possession must be sufficiently established to afford ample assurance of the authenticity of the item.' Whetstone, supra p. 859, and cases cited therein.
 "In Moore, [v. State, 442 So.2d 164 (Ala.Cr.App. 1983)] we stated with reference to a photoelectric intoximeter test:
 " 'To establish a predicate for admitting the test results, without reliance on the [implied consent] statute, there should be evidence that:
 " '(1) the theory underlying the . . . test is valid and generally accepted as such;
 " '(2) the [testing instrument] is a reliable instrument and generally accepted as such;
 " '(3) the . . . test was administered by a qualified individual who could properly conduct the test and interpret the results; and
 " '(4) the instrument used in conducting the test was in good working condition and the test was conducted in such a manner as to secure accurate results.' *Page 958 
 "Moore, supra p. 167 (citing E. Imwinkelried, Evidentiary Foundations, p. 92 (1980)).
 "More recently, the Alabama Supreme Court has stated:
 " 'While we find no Alabama cases which specifically outline all the requisite elements of a predicate for the admission of scientific test results, it is generally held that such a predicate must show that the circumstances of the taking of the sample, the identification, maintenance, and transporting of it, and the testing itself are scientifically acceptable and reasonably expected to produce results which are accurate and reliable. See, e.g., 29 Am.Jur.2d, Evidence, 830 (1967).'
 "Kent [v. Singleton, 457 So.2d 356, 359 (Ala. 1984)] (quoting from Aycock v. Martinez, 432 So.2d 1274, 1277 (Ala. 1983))."
McDaniel v. State, 506 So.2d 360, 364-65 (Ala.Cr.App. 1986). See also Rivers v. Black, 259 Ala. 528, 531,68 So.2d 2, 4 (1953) ("Where there is evidence of scientific tests, such as Drunkometer tests, to determine the amount of alcohol in the breath, it is essential that the reliability of the tests and results thereof be generally recognized and accepted. Failure of the evidence to satisfy this requirement makes such evidence as to the tests inadmissible.").
Jane Trip, the toxicology coordinator for the hospital laboratory, testified that the laboratory ran "anywhere from 150 to 250" blood alcohol tests per month using an "Abbett TDX analyzer." All the drug testing was performed using this instrument. She testified that the "GCI [gas chromatography] method" is approved by the State Department of Forensic Sciences for determining blood-alcohol content and, based on information published by Abbett Laboratories, the TDX analyzer had a correlation coefficient of .997 with the method of determining blood-alcohol content. Upon questioning by the trial court, she indicated that this instrument was widely used in the medical profession at other hospitals as a diagnostic tool or an examination tool for medical purposes as well as for legal purposes. She stated that of the more than 5,000 laboratories that belong to the College of American Pathologists, "there's a little over 3,000 laboratories that have this instrument."
Trip testified that she followed "all the procedures as they're outlined in the procedural manual" in testing the defendant's blood sample. Her testimony concerning "what happens inside the machine" and how the machine operated was based on information furnished to her by the manufacturer. She testified regarding her formal training and experience in operating the machine.
Defense counsel objected to the admission of the test results:
 "Number one that the reliability of this machine, the operational, that the operational procedure has not been set forth as to what was actually followed. Anything to, all information related to the Court concerning the machine, how it operates, how it's calibrated, what must be done, has been totally by hearsay and I would move to exclude that testimony as the Court instructed me not to object during the course of the examination. That it would be hearsay and it was testimony from material printed by the manufacturer. That the proper predicate has not been laid for the presentation of evidence from this machine or this procedure. Also the proper chain of custody of the vial or sample which was tested has not been shown."
In denying the objection of defense counsel and in admitting the test results into evidence the trial court stated:
 "First of all, we're not traveling, as I understand it, under the implied consent law, so the requirements that are set out in the statute with respect to that law are not necessarily applicable. The Court is impressed by the fact that the procedure that is involved here is not used exclusively to determine blood alcohol levels for legal purposes but is used to determine that level for medical purposes as well. It seems to the Court that that gives this procedure an inherent reliability *Page 959 
that might not otherwise be present. And I would be satisfied that there is a scientific basis in fact for the use of this machine in determining blood alcohol levels since it apparently is in wide use in the medical community for medical purposes. While it's true that Mrs. Trip has testified to hearsay with respect to the internal operation of the machine, the vice of hearsay, as I understand it, is its inherent unreliability. But here we have a reliability factor that you don't normally have and that is a machine whose purpose is a medical purpose rather than a legal purpose. And it seems to me that that satisfies the attack on the machine as being unreliable. That is because of hearsay. I am inclined to admit this evidence and let the jury give it what weight it thinks it's entitled to."
"The mere fact that the blood sample was taken at a hospital does not insure its reliability." Kent v. Singleton,457 So.2d 356, 359 (Ala. 1984). In Nelson v. State,551 So.2d 1152, 1154 (Ala.Cr.App. 1989), this Court stated: "[W]e are of the opinion that blood drawn and tested in duplicate by licensed medical technologists in a licensed hospital is scientifically acceptable and reasonable and any results from said tests are accurate and reliable." This finding must be read within the content of that particular case. To the degree that it conflicts with the quoted portion from Kent, Kent must control.
Here, we do not rely merely on the fact that the blood was drawn and tested by medical personnel in a hospital. In this case, the State's evidence shows that the defendant's blood sample was analyzed by an instrument generally accepted in the medical community, that the instrument was commonly employed by hospitals for both "legal and medical purposes" in determining the alcohol content of blood, that the instrument was operated by a qualified technician who followed standard operating procedure in performing the test, and that the instrument was in proper operating order at the time of the test. Upon this testimony, we conclude that the trial court could properly determine that the State laid the necessary predicate for the admission of the test results. "The general rule is well established that the trial court is vested with judicial discretion in determining the sufficiency of preliminary evidence offered to establish a predicate for the admission of other evidence on the trial, to be exercised in the light of the circumstances in the particular case, and this discretion will not be reviewable except for gross abuse." McKee v.State, 253 Ala. 235, 238, 44 So.2d 781, 784 (1949) (concerning the admission of photographs).
 II.
The defendant argues that evidence concerning the cause of death was improperly admitted because the State failed to prove a continuous chain of custody of the victim's body.
Initially, we note that there is no evidence or contention in the record that Mr. Luke died from anything other than the collision with the defendant's automobile. The defendant presented no evidence in his defense.
The record does show that Steve Penland, the deputy coroner of Lee County, pronounced Mr. Luke dead at the scene of the accident at 3:25 on the afternoon of November 23, 1988. Bill Harris of the Alabama Burial Transit Service transported the body to the morgue at the East Alabama Medical Center where the body was received by John Story, the coroner for Lee County. At this time the body was "sealed up."
"Sometime after 9:00 that evening," George Hargrove, a "contract driver" for the Alabama Department of Forensic Sciences, delivered the body from the morgue to Department of Forensic Sciences in Montgomery. The body was placed in a cold storage vault under lock and key. Dr. Allen Stillwell, the medical examiner for the Alabama Department of Forensic Sciences, performed the autopsy at 8:30 on the morning of November 25, 1988.
The chain of custody of the body consisted of Penland, Harris, Story, Hargrove, and Stillwell. Harris and Story did not *Page 960 
testify at trial. Applying the principles listed in Part IA of this opinion, we find that the chain of custody of the victim's body was sufficiently proven by the State. See Bridges v.State, 516 So.2d 895, 903-04 (Ala.Cr.App. 1987).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.