[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1242 
The appellant, Jerome Smith, was convicted of rape in the first degree and kidnapping in the first degree, violations of §§ 13A-6-61 and 13A-6-43, Ala. Code 1975, respectively. He was sentenced to 65 years' imprisonment for the kidnapping conviction and to 75 years' imprisonment for the rape conviction, with the sentences to run concurrently.
The state's evidence tended to show that at around 9:15 p.m. on May 19, 1993, D.H., the 17-year-old female victim, left her job at the Sears department store in Montgomery and proceeded toward her home in Wetumpka. As she was driving home, she noticed one of her tires was going flat, so she pulled off the road at an exit ramp. As soon as D.H. got out of her car to examine the tire, the appellant drove up in his pickup truck. D.H. accepted the appellant's offer to drive her to a service station so that she could telephone her mother.
As D.H. and the appellant proceeded in the appellant's truck to a service station a few miles from D.H.'s home, the appellant asked her if she liked to drink and to smoke pot and he began to make other comments that caused D.H. to be concerned for her safety. The service station was closed when they arrived, and D.H. got out of the truck and telephoned her mother, telling her that *Page 1243 
she was afraid of the appellant and asking her to come and get her. D.H.'s mother told her to stay at the service station and that she was on her way.
After she hung up the telephone, D.H. told the appellant that her mother was coming and that he could leave. The appellant then told D.H. that it would only take a few minutes to fix her tire. When D.H. refused any further assistance, the appellant grabbed her and forced her into his truck. The appellant then drove to a cemetery, where he forced D.H. out of his truck and onto the ground and raped her. When the appellant left, D.H. ran to a nearby house, where she telephoned her father and reported the incident. Law enforcement authorities were then notified.
Shortly thereafter, D.H. was taken to Baptist Hospital in Montgomery, where a rape-kit examination was performed by Doctor Thomas Arnold and Nurse Judy Wohlford Shoemaker. The rape-kit examination included taking blood, saliva, and hair samples and vaginal swabs. The clothes that D.H. was wearing, including her shirt, shorts, and panties, were also collected. The appellant was arrested, and samples of hair, saliva, and blood were subsequently taken from the appellant pursuant to a court order. A forensic serologist for the Alabama Department of Forensic Sciences performed a DNA analysis and determined that the DNA structure of the appellant's blood "matched" the DNA structure of a semen stain found in the victim's panties and on a vaginal swab in the rape kit.
At trial, the forensic serologist testified that "the probability of selecting an unrelated individual at random from the population having a DNA profile matching [the appellant's] [is] approximately one in 351,200 blacks and approximately one in 572,000 caucasians." (R. 491.)
The appellant testified in his defense. Although he did not deny stopping to help D.H. with her tire, he maintained that he left D.H. at the service station after driving her there to telephone her mother.
 I.
The appellant contends that the trial court erred in admitting testimony concerning the results of the DNA analysis performed by the Department of Forensic Sciences because, he says, there was a "missing link" in the chain of custody of the evidence samples collected from D.H. during the rape-kit examination and later submitted to the Department for DNA testing.
Evidence relevant to chain of custody matters showed the following. Dr. Thomas Arnold examined D.H. at Baptist Hospital after the rape on May 19. With the assistance of Nurse Judy Wohlford Shoemaker, he performed a rape-kit examination, collecting samples of blood, saliva, and hair, as well as vaginal swabs from the victim. As the various specimens were collected, Dr. Thomas passed them to Nurse Shoemaker, who then sealed the items inside evidence envelopes provided with the rape kit. According to established procedures for rape-kit examinations, some of the specimens were actually collected from D.H. by Nurse Shoemaker. When the examination was complete, Nurse Shoemaker placed the separate evidence envelopes inside one large envelope, which was also provided as part of the rape kit. She then sealed the large envelope. Nurse Shoemaker also took D.H.'s clothes, including her shirt, shorts, and panties, and placed them inside a separate bag, which she sealed. This bag was not placed inside the large rape-kit envelope. Nurse Shoemaker then handed the large envelope containing the rape kit to Deputy Alexis Wright of the Montgomery County Sheriff's Department. Nurse Shoemaker also handed the separate bag containing D.H.'s clothes to Deputy Wright. Deputy Wright took the large sealed rape-kit envelope and the sealed bag containing D.H.'s clothing and placed them in an evidence locker at the sheriff's department.
After the rape-kit examination of the victim had been performed, Nurse Cassie Kucucmarski, who had not been present during the examination, entered the examining room to clean it and found on a table three sealed envelopes that she recognized as being part of a standard rape kit. No one else was in *Page 1244 
the room at the time. Nurse Kucucmarski telephoned Nurse Shoemaker, her supervisor, and told her about the three envelopes. Nurse Shoemaker told Nurse Kucucmarski that she would notify Deputy Wright to return to the hospital to pick up the three envelopes. (Although there was no testimony as to the exact time Nurse Kucucmarski discovered the three envelopes, Nurse Shoemaker indicated that she received the telephone call from Nurse Kucucmarski "right after I had left." R. 387.) When Deputy Wright returned to the hospital, Nurse Kucucmarski gave her the three envelopes, still sealed. She brought them back to the sheriff's department, opened the large rape-kit envelope that she had earlier received from Nurse Shoemaker, placed the three envelopes inside the large envelope with the other sealed envelopes from the rape-kit examination, and resealed the large envelope. Deputy Wright then placed the large rape-kit envelope back in the evidence locker.
Approximately two weeks later, Deputy Wright delivered the large rape-kit envelope and the separate bag containing D.H.'s clothes to William Landrum, a forensic serologist at the Department of Forensic Sciences laboratory in Montgomery. Both the large rape-kit envelope and the bag of clothing were sealed when Landrum received them from Deputy Wright. Landrum then turned the large rape-kit envelope and the bag of clothing over to Katherine McGeehan, another forensic serologist in the Department's Montgomery laboratory. After opening the large rape-kit envelope, McGeehan performed various laboratory analyses of the specimens contained inside the individual envelopes from the rape kit. She also opened the separate bag containing D.H.'s clothes, and performed various analyses on the articles of clothing. Vaginal swabs in the rape kit tested positive for the presence of semen, as did the victim's panties. Her analyses completed, McGeehan placed the vaginal swabs from the rape kit inside separate manila envelopes and placed a cutting from the victim's panties inside another manila envelope. She then sealed each manila envelope before placing them all in a larger envelope, which she sealed, packaged, and then shipped by United Parcel Service (UPS) to Faron Brewer, a forensic serologist specializing in DNA analysis at the Department of Forensic Sciences Mobile laboratory.
On October 5, 1993, Brewer received the package shipped by UPS from McGeehan. Brewer subsequently performed DNA analysis on the specimens inside and determined that the DNA structure of a semen stain found in the victim's panties and on a vaginal swab "matched" the DNA structure of a sample of the appellant's blood, which had also been submitted to Brewer for testing.
In arguing that there is a missing link in the chain of custody of the evidence samples collected from D.H. during the rape-kit examination, the appellant points to the evidence concerning the three envelopes discovered in the examining room by Nurse Kucucmarski and later placed by Deputy Wright inside the large envelope containing the other envelopes from the rape-kit examination. The appellant notes that Nurse Kucucmarski was not present during the rape-kit examination performed on D.H., did not see what items were placed into the three envelopes, and could not know with any certainty what the contents of the three envelopes were, because she did not open the envelopes before turning them over to Deputy Wright, who also never opened the envelopes. The appellant further notes that Nurse Shoemaker did not see the three envelopes in question after their discovery was reported to her over the telephone by Nurse Kucucmarski, and did not positively identify the three envelopes at trial as being envelopes she had collected during the rape-kit examination of D.H. The appellant maintains that there is some question as to whether the three envelopes ever actually contained evidence samples collected in the rape-kit examination performed on D.H. He says that it is only a matter of "pure speculation" as to what the three envelopes contained. Furthermore, he argues that even if the three envelopes in fact contained specimens from the rape-kit examination of D.H. and were inadvertently left out of the large rape-kit envelope into which Nurse Shoemaker placed the other evidence envelopes from the rape kit, the integrity of the contents of the three envelopes was compromised *Page 1245 
by the fact that they were left unattended in the examining room and were actually in nobody's custody for a period of time. He points also to testimony indicating that other hospital personnel may have had access to the examining room after the rape-kit examination was completed. Once the three envelopes were placed by Deputy Wright into the large rape-kit envelope with the other evidence envelopes holding rape-kit specimens, the appellant argues, it became impossible to determine whether the evidence ultimately subjected to DNA analysis by Brewer came from the evidence envelopes originally placed in the large rape-kit envelope by Nurse Shoemaker, or from the three envelopes discovered by Nurse Kucucmarski. Accordingly, the appellant contends that any evidence concerning the DNA analysis of the contents of the entire rape kit was inadmissible, because the rape kit was "tainted" by the inclusion of the three envelopes, which, he says, represented a break or missing link in the chain of custody of the evidence.
A showing that there has been no break in the chain of custody is necessary to establish a sufficient predicate for admission into evidence. Suttle v. State, 565 So.2d 1197
(Ala.Cr.App. 1990). "The purpose for requiring that the chain of custody be shown is to establish a reasonable probability that there has been no tampering with the evidence." Williams v.State, 375 So.2d 1257 (Ala.Cr.App.), cert. denied,375 So.2d 1271 (Ala. 1979), cited in Suttle, 565 So.2d at 1198.
In Ex parte Holton, 590 So.2d 918, 920 (Ala. 1991), the Alabama Supreme Court stated as follows with regard to the chain of custody:
 "The chain of custody is composed of 'links.' A 'link' is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: '(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinkelried, The Identification of Origin, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973).
 "If the State, or any other proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a 'missing' link, and the item is inadmissible. If, however, the State has shown each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the 'link,' as to one or more criteria or as to one or more links, the result is a 'weak' link. When the link is 'weak,' a question of credibility and weight is presented, not one of admissibility."
Applying the relevant law to the facts in this case, we conclude that the state adequately proved the chain of custody of the evidence in the rape kit: every link in the chain was proved by either direct testimony of the link or by circumstantial evidence. Addressing the specific concerns raised by the appellant, we find that the three envelopes in question do not constitute a missing link, but rather a weak link in the chain of custody, creating a question of the weight and credibility of the evidence, not its admissibility. SeeHolton, 590 So.2d at 920.
In Moorman v. State, 574 So.2d 953 (Ala.Cr.App. 1990), this court stated as follows:
 " 'Evidence momentarily unattended in a hospital setting to which only medical personnel have access is admissible, if otherwise sufficiently authenticated. See McIntosh v. State, 443 So.2d 1275 [Ala.Cr.App.], reversed on other grounds, 443 So.2d 1283 (Ala. 1983) (slide delivered to lab reception area and momentarily unattended admissible); Baynes v. State, 423 So.2d 307, 311
(Ala.Cr.App. 1982) (panties thrown by rape prosecutrix into clothes hamper, and rape kit unattended for hours in hospital both admissible over chain of custody objection).'
 "Reese v. State, 549 So.2d 148, 153
(Ala.Cr.App. 1989) (clothing of injured police officers which had been removed by medical *Page 1246 
personnel in officers' separate hospital rooms, dropped on the floor, and later retrieved by other officers stationed outside the rooms was admissible). See also . . . Blackmon v. State, 487 So.2d 1022, 1024 (Ala.Cr.App. 1986) (where examining physician placed sealed rape kit in secured refrigerated area in hospital and an officer picked up the kit at the hospital later the same day, testimony concerning the test results was admissible). . . .
 " 'The principles governing chain of custody challenges were outlined in United States v. Lane, 591 F.2d 961 (D.C. Cir. 1979), as follows:
 " ' "Tangible evidence of crime is admissible when shown to be 'in substantially the same condition as when the crime was committed.' And it is to be presumed that the integrity of evidence routinely handled by governmental officials was suitably preserved '[unless the accused makes] a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering.' If, however, that condition is met, the Government must establish that acceptable precautions were taken to maintain the evidence in its original state."
 " ' "The undertaking on that score need not rule out every conceivable chance that somehow the identity or character of the evidence underwent charge. '[T]he possibility of misidentification and adulteration must be eliminated,' we have said, 'not absolutely, but as a matter of reasonable probability.' So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in the light of surrounding circumstances.' "
 "United States v. Roberts, 844 F.2d 537, 549-50
(8th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988), quoting United States v. Anderson, 654 F.2d 1264, 1267 (8th Cir.), cert. denied, 454 U.S. 1127, 102 S.Ct. 978, 71 L.Ed.2d 115 (1981). '[R]eal evidence is not [in]admissible because one can conjure up hypothetical possibilities that tampering occurred.' United States v. Haldeman, 181 App.D.C. 254, 559 F.2d 31, 109 (D.C. Cir. 1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). 'If the trial court is satisfied that in reasonable probability the article has not been changed in any important respect, it may permit its introduction into evidence.' United States v. McCowan, 706 F.2d 863, 865 (8th Cir. 1983). 'Although the ideal practice would be for one person to maintain exclusive and constant control of the [evidence], these rules are made for practical people who deal with such evidence as part of day to day routine. The chain of custody requirements aim at a "reasonable probability" that there has been no tampering; they are not intended as an obstacle course or a walk through a legalistic mine field.' Blanco v. State, 485 So.2d 1217, 1220 (Ala.Cr.App. 1986)."
Moorman, 574 So.2d at 956-57.
In this case, there was no evidence suggesting how some other envelopes, also part of a rape kit, could have appeared in the examining room in the period between the time the examination was performed on D.H. and the time the envelopes were discovered by Nurse Kucucmarski, which occurred only shortly after the examination of D.H. was completed. There was no evidence that another rape kit examination had been performed on some other person around the time the envelopes were discovered. The evidence established, as a matter of reasonable probability, that the three envelopes were connected to the examination performed on D.H. and that they were inadvertently left out of the large rape-kit envelope into which the separate evidence envelopes were originally placed by Nurse Shoemaker. Nurse Shoemaker testified that when Nurse Kucucmarski telephoned her to report that she had found the three envelopes, Nurse Kucucmarski told her that Nurse Shoemaker's initials were on the envelopes. Although Nurse Shoemaker did not see the three envelopes after Nurse Kucucmarski telephoned her, she testified that she had placed her initials on the evidence envelopes in the rape kit collected from the victim. Although the appellant correctly points out that Nurse Kucucmarski testified that she did not tell *Page 1247 
Nurse Shoemaker that her initials were on the three envelopes, any conflict in the testimony presented a question of credibility and weight as opposed to admissibility. W.L.L. v.State, 649 So.2d 1335, 1339 (Ala.Cr.App. 1994).
Furthermore, the record contains nothing from which one could infer that the contents of the three envelopes had been tampered with. Testimony indicated that as the rape-kit examination was performed, Nurse Shoemaker placed the specimens inside and sealed each evidence envelope. Nurse Kucucmarski testified that the three envelopes she found were sealed, and Deputy Wright testified that when she received the three envelopes, they were sealed, and that she placed them, still sealed, inside the large rape-kit envelope. "This Court has held that evidence that an item has been sealed is adequate circumstantial evidence to establish the handling and safeguarding of the item." Lane v. State, 644 So.2d 1318, 1321
(Ala.Cr.App. 1994), citing Gray v. State, 600 So.2d 1076, 1079
(Ala.Cr.App. 1992).
We conclude that the possibility that the contents of the three envelopes were misidentified or adulterated, so as to introduce into the stream of evidence other specimens having a DNA profile matching that of the appellant's blood, must be viewed as so remote as to remove from the issue of the chain of custody of the evidence the question of admissibility and to present instead a question of weight and credibility. "The evidence and the totality of the circumstances in this case establish a reasonable probability of the identity of the [contents of the three envelopes] and the integrity of the continuity of possession." Moorman, 574 So.2d at 956. Therefore, the trial court did not err in admitting testimony concerning the results of the DNA analysis performed on evidence from the rape kit over the appellant's chain of custody objection.
Even if we were to determine that the trial court improperly allowed testimony concerning the DNA analysis of evidence from the rape kit, such a determination would be relevant only to the testimony concerning the DNA analysis of the semen found on the vaginal swab taken from D.H. As the facts outlined above indicate, there was also testimony from Faron Brewer, a forensic serologist, that the DNA analysis of a semen stain found on the victim's panties matched the DNA from the known sample of the appellant's blood. The evidence clearly reveals that when the victim's panties were taken from her during the examination by Nurse Shoemaker, they were placed in a separate bag with other articles of her clothing and sealed. The bag containing D.H.'s clothing was in an entirely different streamof evidence from the rape kit containing the vaginal swab. Items from the bag of clothing were never mixed with items from the rape kit; thus, any question concerning the authenticity and integrity of the contents of the three envelopes placed with the rape kit is irrelevant to the issue of the authenticity and integrity of the items of clothing. Accordingly, the appellant's challenge to the chain of custody of the rape-kit evidence has nothing to do with the chain of custody of the victim's panties, which, like the vaginal swab from the rape kit, contained a semen stain with the DNA structure of the appellant's blood. If the DNA evidence concerning the semen stain found on the panties was otherwise properly admissible, any error in the admission of testimony concerning the DNA analysis of the rape kit evidence (i.e., the vaginal swab) would be harmless error. Rule 45, Ala.R.App.P. Because we hold in Part II of this opinion that the other criteria for the admissibility of the DNA evidence were met in this case, we hold that any alleged error in admission of testimony concerning the DNA analysis of the samples in the rape kit was at most harmless error. The evidence concerning the samples in the rape kit was no more harmful to the appellant than the uncontested evidence concerning the DNA analysis of the semen stain found on the victim's panties.
 II.
The appellant contends that the trial court erred in admitting into evidence testimony concerning the results of the DNA analysis because, he says, the state failed to meet the criteria for admissibility of such evidence set *Page 1248 
forth in Ex parte Perry, 586 So.2d 242 (Ala. 1991).
In Ex parte Perry, the Alabama Supreme Court noted that there are two types of DNA evidence: DNA "matching" evidence (evidence that one sample of DNA matches another sample of DNA) and DNA "population frequency statistics" evidence (evidence concerning the frequency with which a given DNA "profile" might occur in a given population). Ex parte Perry, 586 So.2d at 244. The Court then held that in order for either DNA matching evidence or DNA population frequency statistics evidence to be admissible, the party offering such evidence must lay the proper predicate by satisfying the following three-pronged test:
 "I. Is there a theory, generally accepted in the scientific community, that supports the conclusion that DNA forensic testing can produce reliable results?
 "II. Are there current techniques that are capable of producing reliable results in DNA identification and that are generally accepted in the scientific community?
 "III. In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the performance or interpretation of the tests?"
586 So.2d at 250. See People v. Castro, 144 Misc.2d 956,545 N.Y.S.2d 985 (N.Y.Sup. 1989). With regard to the third prong of the test, the Court stated that two questions must be answered: "First, were the techniques used by the testing laboratory generally accepted in the scientific community? Second, was there error in the performance or interpretation of the tests?"Ex parte Perry, 586 So.2d at 250.
In this case, in an effort to lay a predicate for admission of DNA evidence, the state presented the testimony of its expert witness, Faron Brewer, a forensic serologist working in the area of DNA profiling with the Alabama Department of Forensic Sciences. Brewer's testimony included a lengthy discussion of the theories underlying DNA matching and DNA population frequencies statistics and a lengthy explanation of the methods used by the Department in this and other cases involving DNA analysis. In an attempt to counter Brewer's testimony, the appellant put on his own expert witness in the area of DNA analysis, Dr. Ronald Ostrowski.
In his brief to this court, the appellant concedes that the state established the first two prongs of the Perry test with respect to both DNA matching evidence and DNA population frequency statistics evidence. The appellant states that his exceptions to the DNA evidence in this case relate only to the third prong of the Perry test. Specifically, he maintains that the state failed to show that the Department's method of analyzing samples of DNA for purposes of determining a "match" has been generally accepted in the scientific community. He also maintains that the state failed to show the reliability of the Department's DNA analysis by subjecting its laboratory procedures to independent testing in order to determine a "forensic error rate." Finally, he maintains that the state failed to show that the Department's use of only two racial groups to formulate its racial databases is generally accepted by the scientific community as a method of deriving population frequency statistics.
Initially, we note that the appellant has failed to preserve these contentions for appellate review. Although he objected to the admissibility of the state's DNA evidence on a number of grounds at trial,[1] the *Page 1249 
specific grounds raised on appeal were not among those raised below. " 'The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.' " Snowden v. State,574 So.2d 960, 967 (Ala.Cr.App. 1990) (contention on appeal that population frequency statistics evidence was per se inadmissible was waived where the defendant specifically objected at trial that state's expert was not an expert in probabilities, that the frequency calculations were not scientifically reliable or generally accepted in the scientific community, and that the data base from which statistics were derived had changed). See also Saffold v. State, 627 So.2d 1107
(Ala.Cr.App. 1993) (contention that state failed to lay proper predicate for admission of DNA evidence was waived because it was not presented at trial); Yelder v. State, 630 So.2d 92, 105
(Ala.Cr.App. 1991), rev'd on other grounds, 630 So.2d 107
(Ala. 1992) (contention that the admission of population frequency statistics evidence was error because there were no such statistics for Montgomery area was waived, because it was presented for the first time on appeal).
Even if we were to conclude that the appellant's issue had been preserved for our review, we would nonetheless hold the state's DNA evidence to be admissible under the Perry criteria. As we recently noted in Padgett v. State, [Ms. CR-91-1552, January 13, 1995; opinion extended on denial of rehearing, May 5, 1995] 668 So.2d 78, 86 (Ala.Cr.App. 1995), cert. denied,668 So.2d 88 (Ala. 1995), where the trial court was presented with "dueling" testimony from DNA experts for the state and for the accused, "[e]ssentially, this issue as raised by the appellant is nothing more than a question of conflicting expert testimony. . . . Conflicting evidence is always a question for the finder of fact to determine, and a verdict rendered thereon will not be disturbed on appeal." (Citations omitted.) The conflicting expert testimony in this case, like that inPadgett, merely created a question to be resolved by the trier of fact and did not render the DNA evidence inadmissible.
In arguing that the state failed to show that the Department's method of analyzing DNA for purposes of determining a "match" is generally accepted in the scientific community, the appellant points to Dr. Ostrowski's testimony that the reliability of the method used by the Department is currently being "hotly debated" in the scientific community. (R. 552.) However, the state's expert, Faron Brewer, testified that he was not aware of any "hot debate" regarding the method used by the Department. Brewer testified that there are currently three principal methods of DNA testing: the FBI method, the Lifecodes method, and the Cell-Mark method. According to Brewer, the Technical Working Group on DNA Analysis Methods (hereinafter, *Page 1250 
TWGDAM), a quality assurance organization composed of representatives from 22 laboratories engaged in profiling DNA, has performed comparative studies on the three methods and determined them to be comparable in terms of accuracy. Brewer testified that the Lifecodes method is used in the Department's Mobile laboratory and that this method adheres to the TWGDAM guidelines. He stated that the Department used the Lifecodes method when performing DNA analysis of the appellant's blood sample and on the semen stain on the vaginal swab from the rape kit collected when D.H. was examined and on the semen stain found in the victim's panties.
The fact that there were differing expert opinions in this case regarding methodology does not mean that the Department's method was unreliable or inferior to other methods. The appellant's own expert, Dr. Ostrowski, qualified his statement about the "hot debate" over the Department's method of DNA testing by acknowledging that honest, competent, and capable persons held differing opinions about the preferred method of DNA analysis. In Yelder, supra, 630 So.2d 92, this court found that the Lifecodes method used by the Department's laboratory comported with accepted scientific protocol for DNA analysis. See, also, references to the Lifecodes method in, e.g., Exparte Perry, 586 So.2d 242, and Snowden, supra, 574 So.2d 960. The nature of Brewer's testimony in this case regarding the Department's methodology was at least as authoritative as the testimony in Yelder.
The appellant also points to Dr. Ostrowski's testimony criticizing the Department's lack of independent testing by outside sources to assess the reliability of its procedures. However, Brewer testified in detail concerning the quality control procedures used to check the Department's test results, namely, blind proficiency testing with other agencies. SeeYelder, 630 So.2d at 103 (regarding similar proficiency testing performed by technicians at Lifecodes' laboratory). According to Brewer, no errors in the Department's lab have been detected through the blind proficiency testing. Even Dr. Ostrowski conceded that blind proficiency testing is accepted in the scientific community as a method of assuring quality control.
In arguing that the state failed to show that the Department's use of only two racial groups to formulate its racial databases is generally accepted in the scientific community as a method of deriving population frequency statistics, the appellant points to Dr. Ostrowski's testimony that a minimum of three racial-group databases should be used when determining statistical probabilities. In this regard, Brewer testified that he was familiar with the argument that there be three databases rather than two. However, he testified that both TWGDAM and the FBI recommend that databases be composed of the major population groups in the areas for which the statistical frequencies are being compiled, which in Alabama, he said, includes only "caucasians and blacks," as there are no significant groups of hispanic or asian persons in the state. (R. 499-500, 503.)
The appellant has shown no failure by the Department to follow accepted procedures in this case. Nor has he shown that the Department's techniques for DNA analysis are not generally accepted in the scientific community. The conflicting expert testimony in this case merely presented a question for the trier of fact and did not render the state's DNA evidence inadmissible.
 III.
The appellant contends that the trial court erred to reversal by admitting evidence concerning the results of the DNA analysis without first holding a hearing outside the presence of the jury to determine its admissibility. In support of his contention, the appellant cites Hutcherson v. State,677 So.2d 1174, 1191 (Ala.Cr.App. 1994), rev'd, [Sup.Ct.Docket No. 1931660, December 8, 1995],* wherein this Court, quoting fromYelder, supra, 630 So.2d at 102, stated: "Prior to the admission of DNA testimony into evidence, a hearing outside the presence of the jury must be held to determine if the [Perry] test *Page 1251 
has been met." The appellant's contention has not been preserved for appellate review.
As the appellant acknowledges (appellant's reply brief, p. 18), he filed a motion in limine before trial that did not specifically request that the trial court conduct a hearingoutside the presence of the jury in order to determine the admissibility of the DNA evidence. Even if the motion in limine had specifically requested that a hearing be held outside the presence of the jury, the appellant's contention would still not be preserved for appellate review because he did not object to the admissibility of the DNA evidence at trial on this basis.
 "[A]n appellant who suffers an adverse ruling on a motion to exclude evidence (or other matters, e.g., argument of counsel), made in limine, preserves this adverse ruling for post-judgment and appellate review only if he objects to the introduction of the proffered evidence or other matters and assigns specific grounds therefor at the time of trial, unless he has obtained express acquiescence of the trial judge that such subsequent objection to evidence proffered at trial and assignment of grounds therefore are not necessary."
Bacot v. State, 597 So.2d 754, 757 (Ala.Cr.App. 1992).
Furthermore, because we have held that the proper predicate was established in this case, see Perry, supra, we cannot see how the appellant was harmed when the trial court did not first make a determination to this effect outside the presence of the jury.
For the reasons stated above, the judgment of the trial court is due to be affirmed.
AFFIRMED.
All Judges concur.
[1] At trial, the appellant raised the issue of the three-pronged predicate required by Ex parte Perry only allusively, by arguing that the state's DNA evidence did not comply with the requirements and authorities cited in C. Gamble, McElroy'sAlabama Evidence, § 490.01(8) (4th ed. 1991), which discusses the Perry predicate. The appellant raised no specific objections at trial regarding the state's alleged failure to establish the Perry predicate based on the reasons that he now argues on appeal. At trial, the appellant largely argued that the DNA evidence was inadmissible under the recently enacted guidelines of § 36-18-30, Ala. Code 1975 (May 1994), which provides:
 "Expert testimony or evidence relating to the use of genetic markers contained in or derived from DNA for identification purposes shall be admissible and accepted as evidence in all cases arising in all courts of this state, provided, however, the trial court shall be satisfied that the expert testimony or evidence meets the criteria for admissibility as set forth by the United States Supreme Court in Daubert, et ux., et al. v. Merrell Dow Pharmaceuticals, Inc., decided on June 28, 1993."
The appellant specifically challenged the constitutionality of this statute at trial. He abandons this line of argument on appeal, however, and focuses instead on the standards ofPerry, which are actually more stringent than those outlined in § 36-18-30, which adopted the criteria for admissibility of scientific evidence set forth in Daubert v. Merrell DowPharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786,125 L.Ed.2d 469 (1993).
The Perry test for admissibility of DNA evidence is derived from the so-called Frye test for admissibility of novel scientific evidence. Frye v. United States, 293 F. 1013
(D.C.App.Ct. 1923). In Frye, the federal court held that expert testimony based on a scientific technique is inadmissable unless the technique is "generally accepted" as reliable in the relevant scientific community. This became the prevailing standard for determinations of admissibility of novel scientific evidence, see Daubert, 509 U.S. at 583-85,113 S.Ct. at 2792, and is the standard clearly underlying the first two prongs of Perry. See People v. Castro, 144 Misc.2d 956,959-60, 545 N.Y.S.2d 985, 989-88 (N.Y.Sup. 1989) (cited inPerry, 586 So.2d at 248). In Daubert, the Supreme Court held that the Federal Rules of Evidence, specifically Federal Rule 702, superseded Frye's "general acceptance" test for admissibility of scientific evidence and established a more relaxed "helpfulness to the trier of fact" standard based on the trial court's assessment of the relevance and reliability of scientific evidence. Daubert, 509 U.S. at 589-91,113 S.Ct. at 2795. While § 36-18-30 may be an implicit legislative abolishment of the Perry standard, or of at least the first two prongs of the Perry test, we do not feel compelled to address that question here because of the appellant's abandonment of this argument on appeal. However, the trial court would also have been correct in admitting the DNA evidence under theDaubert standard.
* Note from the Reporter of Decisions: On February 23, 1996, the Alabama Supreme Court withdrew its December 8, 1995 opinion inHutcherson and substituted another opinion.