[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 415 
 On Application for Rehearing
This court's opinion of June 6, 1997, is withdrawn, and the following opinion is substituted therefor.
William Wood was employed by the State Department of Corrections ("DOC") as a Correctional Officer I assigned to Kilby Correctional Facility. Effective February 12, 1993, he was terminated from his employment because his urine tested "positive" for marijuana on a random drug screen. He appealed his dismissal to the State Personnel Board ("the Board"). After a full hearing, the hearing officer recommended that the Board uphold the DOC's decision to dismiss Wood. The Board agreed, and Wood then appealed to the Montgomery Circuit Court. In addition, he filed a complaint and a declaratory judgment action, alleging claims under 42 U.S.C. § 1983 and 1988. In December 1993, the case was removed to the United *Page 416 
States District Court for the Middle District of Alabama. In June 1994, the federal district court remanded the cause to state court for a determination of the state law issues; the federal court retained jurisdiction of the federal claims pending resolution of the state law issues. The Montgomery Circuit Court entered two orders in April 1996: one affirming Wood's termination by the DOC and one upholding the constitutionality of the DOC administrative regulation at issue in this case. Wood appealed to this court.
 1. The Validity of Administrative Regulation 227
The DOC Administrative Regulation 227 sets out the procedure for random drug testing of DOC employees. On appeal, Wood raises several issues with respect to the validity of Regulation 227. First, he contends that the regulation is invalid because it was not promulgated in accordance with the rulemaking provisions of the Alabama Administrative Procedure Act ("AAPA"), which require advance public notice and an opportunity for interested persons to comment on a proposed rule. See Ala. Code 1975, §§ 41-22-5 and -6. We hold that Regulation 227 was not subject to the formal rulemaking requirements of the AAPA.
One of the primary purposes of the AAPA is "to provide a minimum procedural code for the operation of all state agencieswhen they take action affecting the rights and duties of thepublic." Ala. Code 1975, § 41-22-2(a) (emphasis added). Promulgation of the DOC regulation concerning employee drug testing was not an "action affecting the rights and duties of the public." Instead, the regulation is an internal policy and procedure statement relating strictly to DOC personnel.
The AAPA excludes from the requirement of administrative rulemaking:
 "a. Statements concerning only the internal management of an agency and not directly and substantially affecting private rights or procedures available to the public.
". . . .
 "c. [I]ntra-agency memoranda, directives, manuals or other communications which do not substantially affect the legal rights of, or procedures available to, the public or any segment thereof."
Ala. Code 1975, § 41-22-3(9)(a) and (c).
The Court of Appeals of Hawaii dealt with an exclusion similar to that appearing in § 41-22-3(9)(a) in In the Interestof Doe, 9 Haw. App. 406, 844 P.2d 679 (1992). In that case, the court held that a police department's field sobriety testing procedures were not subject to administrative rulemaking because they came within a statutory exclusion for matters "concerning the internal management of an agency . . . not affecting private rights." See also Rossie v. State/Dep't ofRevenue, 133 Wis.2d 341, 395 N.W.2d 801 (1986), review denied,134 Wis.2d 457, 401 N.W.2d 10 (1987) (departmental directive that prohibited smoking in certain areas of building and authorized discipline for infractions concerned internal management of agency and was not subject to statutory rulemaking procedures).
 "An agency need not use rulemaking procedures for its rules which affect only the internal personnel practices or internal management of the agency. . . . The mere fact that a rule relates to agency personnel is not always sufficient to remove it from rulemaking procedures. . . . The agency carries the burden of justifying its avoidance of [rulemaking] notice and comment procedures by showing that the effect of the rule is within the personnel or management classes and is solely internal, with no effect on the public."
J. O'Reilly, Administrative Rulemaking § 3.06 at 47-48 (1983).`
The Commentary to § 41-22-3(9) states that in determining what agency actions are subject to administrative rulemaking it is important to
 "distinguish the regulatory activity that resembles legislation, applicable to all persons or a relatively large segment of the population outside the context of any specific controversy, from administrative activity that has a more judicial character and which, therefore, ought to be subject to judicial review. See generally K. Davis, Administrative Law Text § 5.06, at 137-38 (3d ed. 1972)." *Page 417 
Regulation 227 is not analogous to "legislation applicable to all persons or a relatively large segment of the population outside the context of any specific controversy." Instead, it is more like "administrative activity that has a judicial character" because it arises out of a specific controversy (an employee's alleged use of a controlled substance) and addresses personal rights within the context of a personnel action. Because Regulation 227 relates strictly to the internal personnel practices of the DOC and has no appreciable effect on the public, it was not subject to the rulemaking requirements of §§ 41-22-5 and -6.
 2. Evidentiary Issues 2.(a). Chain of Custody
Wood argues that the circuit court erred in determining that there was legal evidence to support the Personnel Board's decision. Specifically, he claims that the admission of the drug test result was erroneous because the DOC did not show a complete chain of custody of his urine sample. Without the test result, he argues, there was no evidence to support his termination.
In Ex parte Holton, 590 So.2d 918 (Ala. 1991), our supreme court stated:
 "The chain of custody is composed of 'links.' A 'link' is anyone who handled the item. The [proponent of evidence] must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each link's possession of the item: '(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and (3) [the] safeguarding and handling of the item between receipt and disposition.' Imwinklereid, The Identification of Original, Real Evidence, 61 Mil.L.Rev. 145, 159 (1973).
 "If the . . . proponent of demonstrative evidence, fails to identify a link or fails to show for the record any one of the three criteria as to each link, the result is a 'missing' link, and the item is inadmissible. If, however, the [proponent] has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the 'link,' as to one or more criteria or as to one or more links, the result is a 'weak' link. When the link is 'weak,' a question of credibility and weight is presented, not one of admissibility."
Holton, 590 So.2d at 920. "Alabama law does not require each link to testify." Ex parte Slaton, 680 So.2d 909, 919 (Ala. 1996), cert. denied, ___ U.S. ___, 117 S.Ct. 742,136 L.Ed.2d 680 (1997).
Captain Terrence McDonnell, a correctional officer supervisor at Kilby, testified that he personally witnessed Wood give a urine sample at 5:10 p.m. on December 17, 1992. McDonnell sealed the sample with tape and watched as Wood wrote the last four digits of his social security number on the tape. At approximately 5:12 p.m., McDonnell placed the sealed specimen in a cooler in the evidence room at Kilby. He said that he and a Captain Garrett had the only keys to the evidence room.
At 10:25 a.m. the following day, McDonnell retrieved the sealed specimen from the evidence room and transported it to Staton Correctional Center, where he gave it to correctional officer Larry Thompson. Officer Thompson testified that he was the drug testing operator at Staton, that he was certified to operate the SYVA-ETS (EMIT) drug testing equipment there, and that on December 18 he received from Captain McDonnell a urine specimen marked with Wood's Social Security number. Thompson said that he tested the specimen and received a positive result for marijuana. He then resealed the specimen and gave it to Captain McDonnell. McDonnell then took it to the Forensic Sciences Laboratory in Auburn and gave it to Dr. Sarawanee Parish.
Dr. Parish testified that she received a sealed urine specimen from Captain McDonnell on December 18. She stated that she tested the specimen for the presence of a metabolite of a cannabinoid by means of a gas chromatograph/mass spectrophotometer (GC/MS), and that she received a positive result for marijuana. Dr. Parish said that in order to test for marijuana via the GC/MS *Page 418 
method, one must "extract" and "derivatize" the urine. She testified that a co-worker, Donald Phillips, had performed the extraction, and that she had performed the derivatization. Donald Phillips did not testify.
Wood argues that there were two missing links in the chain of custody — Captain Garrett, the holder of the other key to the evidence room at Kilby, and Donald Phillips, the laboratory assistant who performed the extraction on the urine sample alleged to have come from Wood. Donald Phillips was a "link" in the chain of custody because the evidence established that he had handled the urine sample. The fact that he did not testify, however, does not mean that there was a "missing link."
The DOC established, through the testimony of Dr. Parish, that Phillips had received, tested, and then transferred the evidence to the next link in the chain.
 "[I]t is to be presumed that the integrity of evidence routinely handled by governmental officials was suitably preserved '[unless the accused makes] a minimal showing of ill will, bad faith, evil motivation, or some evidence of tampering.' United States v. Roberts, 844 F.2d 537, 549 (8th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565(1988).
Smith v. State, 677 So.2d 1240, 1246 (Ala.Crim.App. 1995). Wood presented no evidence of bad faith or tampering on the part of Donald Phillips. Phillips's failure to testify constituted a "weak" but not a "missing" link in the chain of custody; that weakness presented a question of weight, but not a barrier to admissibility. See Holton, supra; Kennedy v.State, 690 So.2d 1222, 1224 (Ala. 1996) (where "there was no direct testimony from the person receiving the evidence at the forensic lab . . . the chain was weakened, but it was not broken").
Captain Garrett, the holder of the other key to the evidence room at Kilby, was not even a link in the chain because there was no evidence that he had received, handled, or transferred the urine sample. At most, Wood has raised only the possibility that there might be a weak link in the chain of custody. SeeW.L.L. v. State, 649 So.2d 1335 (Ala.Crim.App. 1994). " '[R]eal evidence is not [in]admissible because one can conjure up hypothetical possibilities that tampering occurred.' UnitedStates v. Haldeman, 181 U.S.App.D.C. 254, 559 F.2d 31, 109
(D.C. Cir. 1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2641,53 L.Ed.2d 250 (1977)." Smith v. State, 677 So.2d at 1246. Seealso Miller v. Alabama Dep't of Corrections, 640 So.2d 977, 978
(Ala.Civ.App. 1994) (when "there was absolutely no evidence presented that [the particular] specimen had been tampered with," the mere "possibility" that the chain of custody might have been broken was not sufficient to order reinstatement of the terminated employee).
 " ' " 'The evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain.' Slaughter v. State, 411 So.2d 819, 822
(Ala.Crim.App. 1981).' " ' "
Logan v. Personnel Board of Jefferson County, 657 So.2d 1125,1127 (Ala.Civ.App. 1995) (quoting Green v. Alabama Power Co.,597 So.2d 1325, 1328 (Ala. 1992)) (quoting in turn Ex parteWilliams, 505 So.2d 1254, 1255 (Ala. 1987)) (emphasis added by the court in Green). In a civil case involving employee drug testing, "twenty-four hour vigilance of the evidence is not required." George v. Department of Fire, 637 So.2d 1097, 1107
(La.App. 1994).
The evidence was admissible over Wood's chain-of-custody objection. It alone provided sufficient evidence for the circuit court to conclude that the DOC's decision to terminate Wood was supported by the evidence.
 2.(b). Reliability of the Drug Test Result
Wood argues that the drug testing was scientifically invalid, and therefore arbitrary and capricious, for two reasons. First, he claims, the DOC standards for a "positive" result are unacceptably low. DOC uses a 50-nanogram-per-milliliter standard for a positive test result on a marijuana screen. Wood argues that this standard is unsatisfactory because it differs from the 100-nanogram-per-milliliter federal standard that, he *Page 419 
claims, is based on "studies, experiments, and available scientific knowledge." In contrast, he insists, the DOC's standard is a "theory based on an unknown source." On this issue, the hearing officer made the following determination:
 "The Department's using a 50 nanogram per milliliter concentration as a standard for a positive test result appears to be a matter of policy. Your hearing officer has not been presented with any reason or legal evidence in this appeal that adoption of Administrative Regulation 227, or under it, the 50 nanogram standard, as a matter of policy, or the application of the regulation and standard to Mr. Wood, was unreasonable to him or violated any of his constitutional rights."
We agree with the hearing officer that Wood failed to present any evidence or cite any authority that the DOC standard is unreasonable. Wood also failed to present any evidence that a more stringent standard would have excluded the possibility of inadvertent or unknowing ingestion. Moreover, we note that the 50-nanogram-per-milliliter standard has been deemed, by regulation in at least one other jurisdiction, high enough to exclude the possibility of passive inhalation of marijuana. SeeMajor v. Cintas/Red Stick, 665 So.2d 153, 155 (La.App. 1995), writ denied, 669 So.2d 402 (La. 1996).
Wood also argues that there was no showing that the drug testing instruments or their operators were reliable. We disagree. Correctional Officer Larry Thompson testified that he had been trained and certified by the manufacturer of the SYVA-ETS (EMIT) drug testing apparatus at Staton Correctional Center. He stated that the machine is calibrated daily and is inspected annually by the manufacturer. He said that he and other drug testing operators were updated every year by the manufacturer and given polygraph tests. Dr. Sarawanee Parish, a forensic scientist with a Ph.D. in organic chemistry, explained the way she performed and analyzed a urine sample using the a GC/MS test for metabolites of marijuana. The hearing officer, who stated that he himself possessed a chemical engineering degree, questioned Dr. Parish in great detail as to her methodology.
The reliability of the EMIT testing system for drug use has been addressed by several state and federal courts. See, e.g.,Spence v. Farrier, 807 F.2d 753 (8th Cir. 1986); Driver v.State, 576 So.2d 675, 677 (Ala.Crim.App. 1991) (EMIT tests have been found sufficiently reliable to meet the requirements of the Due Process Clause). As to the reliability of the GC/MS testing, Alabama courts have held that when a drug testing expert "describe[s] how she performed a drug analysis using the gas chromatograph spectrometer and the infrared spectrophotometer and also testifie[s] that the forensic sciences community has found the results of these testing devices to be accurate, '[t]he weight to be given the testimony of the expert is a question for the [trier of fact].' " Millerv. State, 687 So.2d 1281, 1286 (Ala.Crim.App. 1996) (quotingMagwood v. State, 494 So.2d 124, 145 (Ala.Crim.App. 1985), aff'd, 494 So.2d 154 (Ala. 1986), cert. denied, 479 U.S. 995,107 S.Ct. 599, 93 L.Ed.2d 599 (1986)). We hold that the DOC adequately established the scientific reliability of the drug testing instruments and operators.
 3. Constitutional Issues 3.(a). Regulation 227 does not establish a conclusive presumption
Wood argues that DOC Regulation 227 establishes a conclusive presumption that an employee who tests positive for a controlled substance is a drug user. He claims that such a presumption denied him procedural due process because it did not allow for the defense of "unknowing ingestion."
A State prison corrections officer who can be terminated only for cause possesses a property right in continued employment protected by the Due Process Clause. Reeves v. Thigpen,879 F. Supp. 1153, 1170 (M.D.Ala. 1995), aff'd, 103 F.3d 147 (11th Cir. 1996). "A presumption is conclusive if a party is not given a reasonable opportunity to disprove either the predicate fact or the ultimate fact presumed." Hall v. Recchi America,Inc., 671 So.2d 197, 200 (Fla.Dist.Ct.App. 1996), aff'd,692 So.2d 153 (Fla. 1997) *Page 420 
At the administrative hearing, Wood testified that he had never used marijuana, that he had not knowingly been in the presence of anyone who had used marijuana, and that he had no idea how he had tested positive for the drug. He further testified that he had worked for DOC for more than 10 years and had tested negative on at least four other random drug screens. Wood's supervisor stated that Wood did a good job and that he had never observed any indication of drug use by Wood.
Wood stated that he had participated in numerous "shakedowns" of inmates coming into Kilby, but that he had never found marijuana at the prison. The warden at Kilby testified that his institution was the general intake facility for the DOC. He gave his opinion that Kilby had less of a drug problem than other correctional institutions because the inmates were thoroughly screened on arrival and they did not remain there long enough, before being transferred to other institutions, to obtain drugs from the outside.
Wood's lawyer argued to the hearing officer that perhaps, during a shakedown, Wood had come into contact with marijuana particles on an inmate's clothing and had somehow unknowingly ingested a minute amount of the drug into his system. The hearing officer concluded that Wood had offered "no legal precedent that the regulation must contain a [requirement of] 'guilty knowledge' by the employee of ingestion of the controlled substance."
Based on the provisions of Regulation 227 itself, and on persuasive authority from another jurisdiction, however, we think that Regulation 227 should be construed to penalize only those who knowingly use drugs. Regulation 227 states its purpose in Part I as follows:
 "To establish policy and procedures for the Alabama Department of Corrections (Department) to collect and test (1) randomly selected eligible employees and (2) any employees where a reasonable suspicion exists concerning unlawful use of controlled substances."
(Emphasis added). The regulation further states, in Part II.B. and C:
 "[B.] Illegal use of controlled substances may jeopardize the safety of Department employees and inhibit their ability to perform all required duties. As a law enforcement agency, it is the clear policy of this Department to discourage the illegal use of drugs.
 "[C.] It shall be the policy of this Department to take disciplinary action against an employee based on toxicological reports from the Alabama Department of Forensic Sciences (or other independent testing laboratory approved by the Department) which identify illicit use of controlled substances."
(Emphasis added). In Part VI.A.6.h., the regulation provides that an employee who is taking prescribed medication shall inform correctional officials at the time of providing a urine specimen. If his urine specimen tests positive, the employee is required to produce the medication in its labelled container or to produce confirmation from his physician or pharmacist. Part VI.B.9 further states:
 "In those cases where medicine is produced in a properly labelled bottle or where a physician's report or documentation from a pharmacist confirms the proper use of the suspected controlled substance, to the satisfaction of the Authorizing Official, the test results will be termed a medical positive requiring no further administrative action."
(Emphasis added.) All of the foregoing sections of Regulation 227 recognize a distinction between lawful and unlawful use of controlled substances. Therefore, we do not believe that the regulation was intended to penalize, as a matter of strict liability, all those whose urine tests positive for drugs without regard to the reason for the positive result. The regulation acknowledges one legitimate "reason" for a positive result: a medically prescribed controlled substance. Likewise, we think that unintentional ingestion of a controlled substance is also a legitimate reason for a positive result. Our conclusion is strengthened by persuasive authority from Florida, a state whose appellate courts have dealt with the same issue. *Page 421 
In Metropolitan Dade County v. Bannister, 683 So.2d 130 (Fla. Dist. Ct. App. 1996), a corrections officer tested positive for cocaine and sought a hearing on her dismissal. The officer testified that she had never knowingly ingested cocaine and that she had a heart condition that would have made using cocaine very dangerous for her. She further testified that she had regularly accepted food from inmates and that, two weeks before her drug test, crack cocaine had been confiscated during a shakedown of a cell in her unit. She also presented evidence that cocaine could be absorbed through the skin by contact with a contaminated substance. The appellate court wrote:
 "[The] hearing officer found that the County had carried its burden of proving that [the officer's] test results were positive and that there was no reason to doubt the reliability of the test procedures or results. He held, however, that 'this drug may have been ingested without the [officer's] knowledge.' "
Bannister, 683 So.2d at 131 (emphasis added). Although the Florida appellate court ultimately reversed the hearing officer's findings and upheld the officer's dismissal, it did not call into question the fact that the employer must prove a knowing consumption of the drug and that unintentional ingestion could, in certain circumstances, constitute a defense.
We hold that Regulation 227 applies to the knowing ingestion of a controlled substance. Nevertheless, we conclude that Wood was not denied procedural due process by what he claims was a conclusive presumption that denied him the right to assert a defense. From the very fact that Wood was permitted to offer evidence and to argue that he might have unintentionally ingested the controlled substance, it is evident that Wood wasnot denied the right, at the administrative hearing, to assert the defense of unknowing consumption.
However, because the hearing officer concluded that, as a matter of law, unintentional ingestion was not a defense to the charge, the hearing officer made no factual finding with respect to the credibility of Wood's defense. This court cannot determine what weight and credibility the hearing officer would have accorded to Wood's defense if he had considered it. The fact that the hearing officer failed to consider Wood's defense requires us to reverse the judgment affirming Wood's dismissal and to remand to the fact-finder.
 3.(b). Burden of Proof
Wood contends that § 36-26-27(a) is unconstitutional because, he says, it placed on him the burden of proving his innocence of the charges against him. Section 36-26-27(a) states:
 "An appointing authority may dismiss a classified employee whenever he considers the good of the service will be served thereby, for reasons which shall be stated in writing, served on the affected employee and a copy furnished to the director, which action shall become a public record. The dismissed employee may, within 10 days after notice, appeal from the action of the appointing authority by filing with the board and the appointing authority a written answer to the charges. The board shall, if demand is made in writing by the dismissed employee within 10 days after notice of discharge, order a public hearing and, if the charges are proved unwarranted, order the reinstatement of the employee under such conditions as the board may determine."
(Emphasis added.) Wood argues that the emphasized portion of the statute puts on the employee the burden of proving that the charges leading to his dismissal were unwarranted. Our supreme court has held to the contrary. See, e.g., Goolsby v. Green,431 So.2d 955, 959 (Ala. 1983)("We note, however, that in the proceeding before the Personnel Board, under the Board's rules and regulations, the burden is on the appointing authority to prove the charges representing the basis for dismissal").
Moreover, at the administrative hearing, the DOC assumed the burden of proving the charge against Wood. It presented its evidence first and made the first and last arguments. At the conclusion of the DOC's evidence, Wood made the customary motions challenging the sufficiency of the DOC's evidence. Specifically, Wood argued *Page 422 
that the DOC had "failed to make [its] prima facie case." The DOC did not take issue with Wood's assigning to it the responsibility of "mak[ing][its] prima facie case." The record of the administrative hearing demonstrates that the burden of proof was not placed on Wood.
Wood argues, in the alternative, that even if the hearing officer placed the burden of proof on the DOC, the hearing officer applied too low a standard of proof — the "any evidence" standard rather than the "preponderance" standard. The hearing officer's report, however, does not indicate what standard of proof he applied to the evidence presented at the administrative hearing. His reference to the "any evidence" standard was clearly a statement of the standard used on appellate or certiorari review of an employee dismissal.
 3.(c). Notification of Test Result
Wood argues that the DOC denied him procedural due process by failing to notify him in a timely manner of his drug test result and thereby denying him the opportunity to obtain a retest. The applicable sections of Regulation 227, effective August 19, 1991,[1] state:
 "VI.B.7. When a screen result is positive, the tested employee will be notified by the Warden, Director or Division Head of the preliminary results as soon as practical.
 "VIII.F. "Wherever in this regulation the words 'shall' or 'will' are used, such are to be interpreted as mandatory."
Wood provided the urine sample on December 17. At the hearing, the parties stipulated that Wood was notified of his preliminary test result five days later, on December 22. When the DOC's counsel asked the warden what efforts he had made to contact Wood about his test result before that time, Wood's lawyer objected, stating "I don't know what the relevancy of this is." The following then occurred:
 "[COUNSEL FOR THE DOC]: . . . . I was trying to show you a legitimate effort was made to get in touch with [Wood] and notify him.
". . . .
 "HEARING OFFICER: Is there any issue as to the procedure leading to the dismissal?"
"[COUNSEL FOR WOOD]: No, I don't think so.
"HEARING OFFICER: Okay, you don't need to do that.
"[COUNSEL FOR THE DOC]: Okay, I'll skip that."
Section VI.B.7. of Regulation 227 requires that an employee be notified of a positive drug screen result "as soon as practical." As the foregoing excerpt from the record of the administrative hearing demonstrates, the DOC's counsel was attempting to inquire into the reasonableness of the notice to Wood when Wood's counsel objected on the ground that the inquiry was irrelevant. When the hearing officer asked whether there was "any issue as to the procedure leading to the dismissal," and Wood's lawyer replied in the negative, the DOC's counsel discontinued the inquiry. Because Wood's own actions at the hearing effectively cut off any inquiry into the reasonableness of the notice and led the DOC to believe that it need not offer any evidence on this point, we think that Wood has waived any issue with respect to adequacy of the notice given.
 "A party may not predicate an argument for reversal on 'invited error,' that is, 'error into which he has led or lulled the trial court.' Dixie Highway Express, Inc. v. Southern Ry., 286 Ala. 646, 651, *Page 423 244 So.2d 591, 595 (1971); see also State Farm Mutual Automobile Ins. Co. v. Humphres, 293 Ala. 413, 418, 304 So.2d 573, 577 (1974)."
Atkins v. Lee, 603 So.2d 937, 945 (Ala. 1992).
Based on the discussion in Part 3.(a), supra, we reverse the judgment of the circuit court and remand this cause with the following instructions: The circuit court shall reverse the order of the Personnel Board and remand the cause to the Board with instructions for the Board to direct the hearing officer to make a specific finding of fact as to the weight and credibility of Wood's unintentional ingestion defense and to reconsider his recommendation to the board in light of that finding.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; RULE 39(k) MOTION DENIED; REVERSED AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and YATES, MONROE, and THOMPSON, JJ., concur.
[1] There were three versions of Regulation 227 arguably relevant here: the first, effective July 28, 1989; the second, effective August 2, 1990; and the third, effective August 19, 1991. The hearing officer made the following findings with regard to Regulation 227:
 "[At the administrative hearing, the] Appellant and the Department stipulated to a copy of Administrative Regulation 227 dated July 28, 1989, as applicable to Mr. Wood's termination and it was admitted into evidence as Employee Exhibit # 1. On June 24, 1993, counsel for Mr. Wood served notice that a version dated August 19, 1991, was in fact the regulation applicable to the termination and not Employee's Exhibit # 1. The Department did not traverse the Appellant's notice. The version of Administrative Regulation 227 dated August 19, 1991, has been admitted into evidence as Employee's Exhibit #2 and has been used as the controlling version of the regulation in this appeal."